## C. R. WEATHERSBY v. THE STATE.

*No. 3600.    Decided December 17.*

1. **Practice — Organization of the Petit Jury.** — After the special venire was exhausted without completing the jury the defendant moved that before talesmen should be ordered from the body of the county the regular jurors selected by the commissioners for the week should be called and tried as jurors. Seven of the jurors selected for the week who were not on the special venire already exhausted were present. The motion was overruled, and talesmen from the body of the county, by direction of the court, were summoned by the sheriff, and from the talesmen so summoned the panel was completed. The bill of exceptions reserved to this action of the court is insufficient to present a question for revision, because it does not show that even if he had the legal right to complete the jury from the jurors selected for the week by the commissioners he was not in fact accorded that right and that the jury was not so completed; and further, that by the action of the court a juror or jurors were forced on him who had not been selected by the jury commissioners.

2. **Same—Cases Overruled.**—But, independent of the principle of practice above announced, the defendant under the revised code (Code Crim. Proc., art. 612) was not entitled to have the regular jury called and tried to complete the panel before talesmen were ordered from the body of the county. Such was the practice prior to the revision of the codes, when there was no statutory provision directing the procedure after the exhaustion of the special venire. The existing statute prescribes that "when from any cause there is a failure to select a jury from those who have been summoned on the special venire, the court shall order the sheriff to summon any number of persons that it may deem advisable for the formation of a jury." In so far as in conflict herewith the cases of Weaver v. The State, 19 Texas Court of Appeals, 547, and Cahn v. The State, 27 Texas Court of Appeals, 709, are overruled.

3. **Same—Evidence.**—It is a well settled rule of evidence that whatever is said by any party to the transaction at the time of the transaction is a part of the transaction itself, and is admissible in evidence as part of the *res gestæ*. The fatal shot was fired by one Keller, the defendant being present. The theory of the State was that the fatal shot was fired by Keller in pursuance of a conspiracy between himself and defendant to kill the deceased and his brother, W. H. Pope (who simultaneously with the shooting of the deceased by Keller was shot and wounded by defendant). Over the objection of the defense W. H. Pope was permitted to testify that within twenty seconds after the last shot was fired, and after defendant had left or while he was leaving the scene of the shooting, and while an officer was about to arrest Keller, he said to Keller: "You have murdered Major Turner and my brother, and shot me all to pieces; you brought your ruffianly brother-in-law here to do it; you have broken a woman's heart by robbing her of her baby, and now you want to finish up by murdering her un-

armed counsel." *Held*, that under the rule announced the testimony was competent as *res gestæ*, and was properly admitted, notwithstanding the absence of defendant, and notwithstanding the fact that Keller at the time was under arrest.

4. **Same—Intent.**—Over the defendant's objection it was proved by the State that when the defendant was arrested and brought back to the scene of the shooting, a few minutes thereafter, Major Turner, who had been wounded in the affray by the defendant, said to him, "Dick Weathersby, you tried to murder me, but you failed;" to which the defendant replied, "You are a God damned lying one-legged son-of-a-bitch." *Held*, that the testimony was properly admitted. The rule is that the declarations and conduct of a defendant, either before or after the offense, are admissible evidence against him as indicating the intent and motive which actuated him in the transaction with which he is charged, although such declarations may not be *res gestæ* of the transaction. The fact that the defendant was under arrest when he made the declaration to Turner is immaterial, inasmuch as the declaration involved no confession of guilt.

5. **Manslaughter—Accidental Homicide—Charge of the Court.**—See the opinion *in extenso* and the statement of the case for the substance of evidence *held* not to raise the issues either of manslaughter or accidental homicide; wherefore the trial court did not err in refusing to submit the issue of manslaughter in charge to the jury; and though erring in submitting the issue of accidental homicide, it was error in favor of the defendant and therefore not revisable.

6. **Same—Circumstantial Evidence.**—It is only when the State's case rests wholly and entirely upon circumstantial evidence that the trial court is required to give the law of circumstantial evidence in charge to the jury.

7. **Practice—Privilege of Counsel.**—See the statement of facts for the substance of remarks used by counsel in argument *held* to constitute a breach of the privilege of argument, but not, under the circumstances of the case, to constitute material error. And note the insufficiency of the bill of exception to disclose probable prejudice to the accused by reason of the action of bystanders in applauding the State's counsel at one period of his argument to the jury. Note further the approval of the action of the trial judge in rebuking the bystanders for such applause.

8. **Continuance—New Trial.**—See the opinion for the substance of absent testimony set out in an application for continuance *held* though material in substance to be, in view of the evidence on the trial, not probably true; wherefore the trial court did not err in refusing a new trial because of the said absent testimony.

APPEAL from the District Court of Smith on change of venue from Harrison.  Tried below before Hon. F. J. McCord.

The indictment in this case charged the appellant and W. T. S. Keller jointly with the murder of Alexander Pope, in Harrison County, Texas, on the 6th day of December, 1889.  A severance being awarded upon the motion of the defense, the appellant was placed upon trial.  His trial resulted in his conviction in the second degree, a term of five years in the penitentiary being the penalty assessed by the jury.

The evidence shows that the difficulty in which the deceased was killed and his brother, State Senator W. H. Pope, and Major James Turner were wounded occurred in the District Court room, in the city of Marshall, Harrison County, Texas, on the 6th day of December, 1889.  Court was in session at the time, J. S. Blanton, Esq., presiding as special judge.  It appears that in November, 1888, a suit for divorce was filed in the said District Court by W. T. S. Keller against his wife, and that during that

month the regular district judge, Hazlewood, issued an order awarding to Keller the custody of an infant child. Subsequent to that order, and after the expiration of Judge Hazlewood's term of office, the attorneys for Mrs. Keller, the deceased, W. H. Pope, and James Turner, applied for an order changing the custody of the child to Mrs. Keller. The new district judge, Booty, being disqualified, J. S. Blanton was appointed special judge to try the matters involved in the said suit for divorce. The order prayed for by the attorneys of Mrs. Keller was granted by Judge Blanton, and the custody of the child was awarded to Mrs. Keller. The plaintiff's motion to revoke that order and restore the custody of the child to W. T. S. Keller was the proceeding on trial at the time of the tragedy.

W. H. Pope, the brother of the deceased, was the first witness for the State. He testified, in substance, that in the proceeding pending in court at the time of the tragedy he and his brother, the deceased, and Major Turner represented Mrs. Keller as counsel. Messrs. M. R. Geer and T. P. Young represented W. T. S. Keller, the plaintiff. The court room was a large one. The judge's stand was in the southern extreme of the room. The jury box was east of the judge's stand and the clerk's desk west of it. These were within the bar, and the railing which separated the bar from the other part of the room extended entirely across the room and had two gates in it. The witness, his brother, the deceased, Major Turner, W. T. S. Keller, M. R. Geer, T. P. Young, the defendant, the district clerk, and one or two others were within the bar from the time the judge took his seat on the bench. A table within the bar separated the witness from the deceased, Keller, and others. The plaintiff's motion to set aside Judge Blanton's order awarding the custody of the child to its mother was made upon the ground that Judge Hazlewood had previously entered an order awarding it to its father, Judge (W. T. S.) Keller. The defense, represented by witness, deceased, and Turner, opposed the motion upon the ground that the Hazlewood order was obtained by fraud; that notwithstanding it had been agreed by counsel for plaintiff and the defendant that the question of the custody of the child should be determined by Judge Hazlewood upon the record, the plaintiff went to Carthage, filed an amendment in the case, and secured the order of Judge Hazlewood in an ex parte proceeding. Mr. Geer, for the plaintiff, made a few animated remarks to the court, to which the deceased replied. The witness, thinking that the deceased, who was then unwell, had not made the objection as clear as it might have been made, leaned over the table and asked deceased to give way to him to say something. He, witness, then addressed the court, saying, "We do not mean fraud on the part of the attorneys, but on the part of the plaintiff himself." Keller rose to his feet and addressing witness said, "That is false." Witness asked Keller, "Do you mean to say that I speak a falsehood?" Keller replied, "Yes." Thereupon the witness seized a walking stick that was lying on the table before him; Geer

arose from his seat and witness threw the stick over Geer at Keller, who "ducked" and drew his pistol. At that instant the defendant drew his pistol and fired at witness. That was the first shot fired. It missed witness, but knocked down Major Turner, who at that time was standing at the water bucket in the window. Defendant instantly fired his second shot, which struck the witness in the breast. Witness threw up his right hand, and shaking his finger at defendant said to him, "Shoot, you coward, I am unarmed." About that time defendant fired his third shot, and at the same instant a shot was fired from about where Keller was standing. After firing his third shot the defendant advanced upon the witness, and witness thought his purpose was to grapple with and shoot him, witness, again. Accordingly witness moved around the table toward Keller to get away from defendant. He discovered Keller dodging about trying to see through the smoke and grappled with him. Keller threw up his right hand, in which he held his pistol. Witness caught his right hand and pulled it down, when Keller thrust it against witness's side. At that moment witness felt that his right arm was paralyzed. Accordingly with his left hand he made a backward motion, pushed Keller's pistol hand away, and the pistol exploded behind witness's back.

The witness could not swear that the defendant fired at him oftener than three times. The last that witness saw of defendant during the transaction he was advancing upon witness and witness was moving to get out of his way. The witness was satisfied that the last shot fired was the one fired by Keller when he, witness, pushed Keller's pistol away from and behind him, witness, as above stated. Witness then begun to denounce the defendant and Keller, the former having left. The witness moved during the shooting from where he was at first, around the table to where Keller was. After the last shot was fired Keller changed his position, moving toward the bar railing. The witness next saw Mr. Lewis going toward Keller, and his impression was that it was Lewis's purpose to arrest and disarm Keller, but he did not do it at that immediate time. It was then between fifteen and twenty seconds after the last shot was fired, the witness being then about eight feet distant from Keller. Witness then said to Keller, "You have murdered Major Turner and my brother, shot me all to pieces, and brought your ruffianly brother-in-law here to do it." Witness continued to denounce Keller, followed him up, and about the time Lewis arrested him (Keller) said to him, "You have broken a woman's heart by robbing her of her baby, and now you want to finish up by murdering her unarmed counsel." Keller said nothing, but eyed the witness from head to foot, when witness said to him, "I could get a gun and kill you, but I am too brave to shoot an unarmed man." Keller and the defendant were brothers-in-law. Witness was shot in two places. Defendant fired the first two shots. One of these shots struck witness in the left breast, about an inch above the

nipple. It was a "raking" shot, the ball turning on the ribs to and through the fleshy part of the left arm. Another ball went through the fleshy part of witness's right arm below the elbow.

The deceased during the shooting and at the time he was shot was on the opposite side of the table from the witness. The only time witness observed deceased during the shooting he was standing before Keller with his hands up. He had just then said, "Don't, Did!"—"Did" being Keller's nickname—and was moving towards Keller when witness last saw him. He said nothing else that witness heard. At some time during the shooting the witness seized an inkstand but immediately and mechanically threw it down, but at nobody. He did not know at what juncture he seized the inkstand, but his impression was that it was about the time defendant fired the second shot, which wounded witness in his breast. Unless he had reached for the inkstand the witness had nothing in his hand when defendant shot him. Defendant was to the right of and at a right angle to the witness, both being on the east side of the court room. Keller, the deceased, and Geer were on the opposite side of the table from the witness, Geer in the middle, with deceased and Keller respectively to his right and left. Defendant was not quite behind Keller but stood obliquely to his left, three or four feet further from witness than Keller was. Witness saw no pistols other than those in the possession of Keller and defendant, and saw no shots fired by any person other than them. He only saw one shot fired by Keller. Defendant's two first shots—the first fired—and one fired by Keller were the only shots that witness saw fired, but he heard others.

The witness saw the defendant two or three different times on the day of and before the tragedy, going to and fro between the court house and the building in which Mr. Young had his office. He saw defendant and Keller together as many as three times on that morning before the shooting. Just before the proceedings in court began the witness observed defendant and Keller in the jury box, occupying chairs at opposite ends of a row. The witness saw the defendant and Keller together, as well as he could recollect, on the square in Marshall on the day before the tragedy. He could not be absolutely positive that it was the day preceding the tragedy, but that was his recollection.

This witness was subjected to a searching cross-examination. It resulted in a substantial reiteration of the substance of the witness's testimony in chief, and a somewhat clearer indication of the positions of the several parties during the trouble. It showed definitely that when the witness seized and threw the walking stick, at which time Keller drew his pistol, the witness was on one side of the table and that the deceased and Keller, on either hand of Geer, were on the opposite side of the table from the witness. This evidence was especially material in view of the defensive theory that the shooting of the deceased by Keller was acci-

dental. Referring to the suit of Mrs. Bettie Pope, the widow of the deceased, against the Fidelity and Casualty Insurance Company upon an accident policy issued upon the life of deceased, the witness said that he did not know whether or not his name was signed to the petition in that suit, but that he was one of the attorneys representing the plaintiff in that case. He expected to recover in that suit upon a parenthetical clause in the policy which reads: "It" (the insurance policy) "shall be valid if life is lost in an attempt, or a reasonable attempt, to save human life." The witness knew Will Adair, who represented himself to be the reporter of a newspaper. He was interviewed by Adair soon after the shooting, and made some but not all of the statements to Adair contained in what purports to be Adair's report of the said interview in the Dallas News. Witness denied emphatically that he told Adair in that interview that the deceased caught hold of Keller. He denied also that he told Adair in that interview that as deceased started towards Keller he, witness, saw that Keller was about to shoot deceased, and that thereupon he, witness, threw an inkstand at Keller. As a fact, if deceased took hold of Keller at any time the witness did not know it. He did know that deceased, when witness last saw him, was not in reach of Keller.

M. R. Geer, one of the counsel for W. T. S. Keller in the divorce case and the proceedings therein pending at the time of the tragedy, was the next witness for the State. He testified, in substance, that when the pending matter—the custody of the child—was called up for hearing the counsel for Keller moved for the revocation of the order of the court changing the custody of the child from W. T. S. Keller to Mrs. Keller upon the ground that the pleadings whereon the order was issued set up only the matter which had been previously adjudicated by Judge Hazlewood. This motion was argued pro and con, the deceased and Major Turner speaking for Mrs. Keller. At this time W. H. Pope was sitting on one side of a table and the witness, the deceased, and Keller on the other or opposite side, Keller being at the witness's left and the deceased at his right hand. At the conclusion of the remarks of the deceased upon the motion, wherein he said that the defense resisted the pending motion upon the ground that Judge Hazlewood's order awarding the child to the plaintiff was obtained by fraud, W. H. Pope leaned over the table and said to deceased, "Tell the court that we attack the order for fraud, not of the attorneys but of the plaintiff." Keller arose and said to W. H. Pope, "That is false." W. H. Pope instantly seized a walking stick that was lying across the table and hurled it at Keller. Defendant, who was then standing six or eight feet distant from Keller, and somewhat further from W. H. Pope than Keller was, fired at W. H. Pope. Keller "ducked" or squatted behind the witness when W. H. Pope threw the stick. He straightened up, drawing his pistol, and about that time the deceased, with his hands uplifted, started towards Keller and exclaimed to him, "Oh, Did., don't shoot

brother Will." Keller, however, from behind the witness pointed his pistol toward the place where the deceased was standing and fired two shots in the direction of that place. At about the instant that Keller fired his first shot toward the deceased the defendant fired a second shot at W. H. Pope. In point of time the throwing of the stick by W. H. Pope and the firing of the first shot by the defendant was about simultaneous. W. H. Pope said, "Look at that miserable fellow going to shoot me." Thereupon the defendant fired. W. H. Pope then said, "Look at the coward going to shoot me again," and defendant again fired. Defendant's second and Keller's first shot were fired at about the same time. Each fired one shot after that, and those shots—three by defendant at W. H. Pope and two by Keller toward the deceased—were the only ones of the shots fired that the witness saw. Witness and the deceased left the court room together immediately after the firing of the shots mentioned, at which time witness did not know that he, deceased, had been wounded. The witness did not think that the defendant moved from where he fired the first shot until after he fired the third. In firing he held his pistol in both hands. The expression of his face indicated a fixed determination to shoot and kill W. H. Pope. W. H. Pope would contract his body as much as possible as defendant fired the three several shots, but he did not move from his place until after the defendant's third shot was fired, when he moved around the table towards Keller. W. H. Pope's hands fell to his sides after the defendant's second shot. After the third shot, according to the recollection of the witness, W. H. Pope threw an inkstand across the table at Keller. The deceased, when he started toward Keller with his uplifted hands and called to Keller not to shoot his brother, W. H. Pope, had nothing whatever in his hands nor did he take hold of Keller.

So far as the witness could remember, the defendant was in the court house when he, witness, first saw him on the fatal day. He occupied a seat inside the bar near the judge's stand. Witness may have seen him on the street before court met, but he had no recollection of it. He met Keller in Mr. Young's office on that morning, and next saw him in the court house. The incidents of this transaction followed each other in rapid succession, the entire difficulty occupying but few seconds. Other shots than these mentioned by witness were fired, but witness did not see them.

Cross-examined, this witness stated that W. H. Pope was sitting down while the deceased was arguing the motion before the court. He arose from his chair as the deceased was about to conclude his remarks, leaned across the table, and suggested a further statement to deceased. Keller was then on his feet or was in the act of rising to his feet. He pronounced W. H. Pope's suggested statement to deceased false. W. H. Pope then seized the stick and was in the act of throwing it when the defendant fired the first shot. Witness did not think the inkstand was thrown by

W. H. Pope before Keller fired the first shot, and he knew as a fact that it was not thrown until after defendant had commenced shooting. It was witness's opinion that W. H. Pope threw the inkstand about the time of the third shot. There was little if any difference in point of time between defendant's first shot and W. H. Pope's exclamation, "Look at the coward going to shoot." Keller, at the time of the shooting, was a little southwest, and between six and eight feet distant from defendant. Keller faced south and southwest from the defendant, and was nearer W. H. Pope than defendant was. The witness knew about the accident policy on the life of the deceased, and in that matter he made the proof of death. He, however, had never stated that deceased was accidentally killed. He simply stated in that matter that deceased was killed, detailing the circumstances of death as he has stated them on this trial.

On redirect examination the witness testified that W. H. Pope and the defendant were facing each other during the shooting. He did not remember seeing Keller turn toward defendant during the shooting. Deceased was south of the defendant, and the shots fired by Keller were fired toward deceased.

T. S. Henderson testified for the State, in substance, that he was present and saw the fatal difficulty. He did not hear what was said by any of the parties, but saw W. H. Pope throw the stick immediately after Keller made a remark. At about the same time he heard a shot fired from about where the defendant was then standing. Keller then drew his pistol. He had some difficulty in getting it out, but as soon as he did he went to shooting as fast as he could, advancing as he did so. The last that the witness saw of the deceased he was standing with his hands uplifted. The witness saw Keller when he came into the court room on the fatal morning. He then took a seat on the west side of the judge's stand. Soon afterwards the defendant came into the court room and took a seat near Keller. After a short while Keller left the court room. A few minutes later the defendant left the court room. After a time Keller returned to the court room and resumed his seat west of the judge's stand, and a few minutes later the defendant came back and took the same seat near Keller which he had previously occupied. Keller and defendant both looked excited each time they came into the court room. Witness attributed Keller's excitement to his position in the pending judicial proceeding, but could see no reason for excitement on the part of defendant.

The State introduced in evidence the dying declaration of the deceased, having proved the necessary predicate, that he was in his right mind when he made them, was conscious of approaching death, and without hope of recovery, etc. It reads as follows:

"The dying declaration of A. Pope, made by him in view of his approaching death; made voluntarily and in the presence of witnesses:

"I, Alexander Pope, do declare the following to be the facts about my

getting shot: I was in the District Court room trying the case of Keller v. Keller for the custody of the children. Some preliminary matters were being settled, when Keller jumped up and said that a statement made by us was false. Brother Bill threw a stick at him; Keller drew his pistol and I said, 'Oh, don't, Did.!' and he shot me. I did nothing to him and had nothing but a pocket knife, which was in my pocket. I then started down the stairs, shot. W. T. S. Keller shot me for nothing. I simply wanted no killing was the reason I done what I did. W. T. S. Keller shot me for nothing, in Harrison County, Texas.

[Signed]                              "ALEXANDER POPE."

Rev. J. T. McBride, testifying for the State, said that he reached the deceased at or near noon, about a half or three-quarters of an hour after he was shot, and remained with him until his death, which occurred about 9 o'clock on the night of the same day. The witness was in or about the room when deceased made the detailed statement read in evidence. He knew when deceased was making that statement, but did not listen to it. Twice at least—the first time between 12 and 1 o'clock and the last time about 6 o'clock in the evening—the deceased said: "Did. Keller shot me for nothing, and while I was holding up my hands. I said to Keller, 'Did., don't shoot me; I am unarmed.'" Deceased was then rational and conscious of approaching death.

Doctor Asa Pope, the brother of the deceased, testified for the State that he reached the deceased soon after he was shot. Upon reaching him he asked him, "My God, Alex., how did this happen?" Deceased replied: "I was pleading for Bill's life and asked Keller not to shoot him, and he turned and put his pistol against me and shot. That was the first I knew of his shooting me. I said to Keller, 'Don't shoot brother Bill,' and held up my hands before him."

H. H. Womack testified for the State that he was not a witness to the shooting, but saw the defendant as he emerged, running, from the north door of the court house immediately after the firing was over. Defendant then had a pistol in his pocket. Some person asked defendant what was the matter. He replied, "Damned if I know," and continued his flight toward his home.

S. Kraft testified for the State that he was in the City Saloon, about twenty-five yards distant from the court house, at the time of the shooting. A few minutes before the shooting occurred the defendant entered the saloon. Witness and others were then shaking dice. Somebody asked defendant to join. He replied that he had to go to the court house and did not have time. He then left the saloon hurriedly. He said nothing about being a witness.

J. S. Record testified for the State that about a year prior to this tragedy he had a conversation with the defendant about the Keller divorce case, which was then pending. That conversation occurred at the steps of the

old court house. Witness, referring to the Keller divorce case, remarked to the defendant, "I hope they will make a compromise of this thing." Defendant replied, "I hope they will." About that time a man named Vance, the brother of Mrs. Keller, passed the court house at a short distance. Defendant pointed at Vance and said: "Do you see that son-of-a-bitch? Well, he is making himself very conspicuous, and if he don't mind there will be a great big shooting scrape." On his cross-examination this witness said that at the time referred to he regarded defendant as a friend trying to compromise the Keller divorce case. He said nothing about Mrs. Keller's lawyers. He merely pointed at Vance and said: "That man is making himself very conspicuous. If some people don't mind there will be a hell of a shooting scrape." Witness understood him to refer to Vance.

Medical proof shows that the fatal ball entered the right chest of the deceased, powder burning the flesh, between the tenth and eleventh ribs and passed out just above the right hip. Defendant was the brother-in-law of Keller.

T. P. Young was the first witness for the defense. He testified substantially as did the witnesses for the prosecution as to what transpired in the court room from the time court convened on the fatal morning until the shooting commenced. He saw W. H. Pope seize and throw the stick; he saw Keller dodge or squat, and then straighten up, drawing his pistol as he straightened; he, witness, then ducked his head and saw nothing that occurred. As he ducked he heard the report of a pistol—the first shot fired. He knew that Keller did not fire that shot, but did not know who did. W. H. Pope appeared to exert his full strength in throwing the stick at Keller. The stick was an ordinary ebony gold headed walking cane, about a half inch in diameter at the small end and about an inch in diameter at the large end, and would weigh about three-quarters of a pound. Witness saw no person but Keller with a pistol until after the shooting was over, when he saw the defendant putting a pistol in his pocket as he left the court room. The defendant was present in the court room on the fatal morning under subpœna as Keller's principal witness in the matter pending before the court. It was evident that he felt a great personal interest in Keller's suit. Defendant and Keller, to the best of witness's recollection, were together in witness's office on the day preceding the shooting. They were in that office on the morning of and preceding the shooting, and went from that office to the court room, the witness and Keller going together and defendant following. Deceased was in the witness's office on the day before the difficulty. Judge Keller was in the office at the time. Deceased said to him, "Good morning, judge." Keller replied, and after speaking to witness about a matter of business deceased left. The witness knew Jack Vance and Den Hill, but did not see either of them in town on the fatal day.

Judge J. S. Blanton, testifying for the defense, described the incidents of the difficulty substantially as they were related by previous witnesses, stating that the first hostile demonstration was made by W. H. Pope in throwing the stick, which he apparently threw with all of his force. The stick was the property of the witness, and was correctly described by the witness Young.

W. A. Adair testified for the defense that he was the correspondent of the Dallas News at the time of the tragedy. Witness secured an interview with W. H. Pope three or four hours after the difficulty. The "notes" now exhibited to witness were the notes of that interview as written by the witness. The report published in the Dallas News conformed in substance to the notes, and the notes and report were, in the opinion and belief of the witness, a substantially correct reproduction of the said interview. Witness remembered some things stated by Senator Pope, independent of his notes. Observing ink on Senator Pope's hand, the witness asked him if he threw an inkstand. According to witness's recollection, and as appears from his notes, Senator Pope replied that he threw the inkstand at Keller because he thought Keller was going to shoot the deceased. According to witness's recollection, aided by his notes, Senator Pope said, "I closed with Keller; Keller shoved his pistol in my side, and I knocked it to one side with my elbow, and the sheriff caught him." At this point the witness was asked by counsel, "Did Senator Pope state on that occasion as follows: 'As Alex. started to Keller I saw Keller was about to shoot, and I threw an inkstand at him?' The witness replied, "To the best of my knowledge and belief, he did." It was two or three days after this interview when witness next saw Senator Pope. He, Pope, did not then complain that the report of the interview was incorrect, but he subsequently made that complaint. The witness thought his report of his interview with Senator Pope was correct, but admitted that it was possible that he made some mistakes in writing it down. He knew W. H. Pope's reputation for truth and veracity. It was unimpeachable, and as good as that of any man in Harrison County. Senator Pope, at the time of the interview, was confined to his bed by his wounds, and he told the witness that he was suffering to an extent that rendered him unable to make a succinct statement of the difficulty. Parts of Pope's statement the witness wrote out in full; other parts, the long statements, he wrote in an abbreviated hand and in his, witness's, own language.

The following appears in the record as a cross-examination of this witness: "The notes taken by Senator Pope's bedside are the same as those in the newspaper. (State objects to the foregoing and objection sustained.) Witness reads aloud from his notes: 'Keller, when I threw the stick at him, stepped back and drew his pistol. My brother Alex., seeing his movement, caught him as I thought. As Alex. started to Keller

I saw Keller was going to shoot, and I threw an inkstand at him. I think Weathersby fired.' The court stops witness from reading. Above is supposed to be W. H. Pope's statement to witness as taken down by witness at the time."

Miss Fanny Keller, the daughter of W. T. S. Keller and his wife, Mrs. E. H. Keller, testified for the defense that for the last two years she had lived with her father in San Angelo, Tom Green County, Texas. Witness visited Marshall in May or June, 1889, during which visit she saw and conversed with her mother. In the course of that conversation witness's mother said to witness: "The people of Marshall all wonder how your father can come here and go back alive. He can not walk the streets of Marshall with his head up. There are three men here ready to kill him at any time." Upon her return to San Angelo the witness told her father what her mother said. Her father went to Marshall in December following, which was the month in which the killing of the deceased occurred.

Joe Keyes testified for the defense that between ten and twenty minutes before the shooting the defendant came into Blalock's saloon where witness and others were throwing dice. He declined to join in the game, excusing himself upon the ground that he had to go to the court house presently. The witness, when he heard the shooting, ran to the court house. He met the defendant between the court house door and the yard gate, and asked him, "Uncle Dick, what's the matter up there?" Defendant replied, "I don't know; they have killed Keller and tried to kill me." Defendant was walking fast, but not running. If he then had a pistol on his person the witness did not see it.

J. H. Taughey testified for the defense that the defendant came into his store about fifteen minutes before the shooting and bought some tobacco. Witness did not remember that he bought hoarhound candy. He was alone.

R. S. Keller, the father of Judge W. T. S. Keller, was the next witness for the defense. He testified that he lived in Harrison County, and identified a letter offered in evidence as a letter written by him to W. T. S. Keller, in San Angelo, on July 11, 1889. An extract from said letter reads as follows: "I understand that she [meaning W. T. S. Keller's wife] says they had the man staked out to kill you when you was in here last, and that if you had opened your mouth the ball would have opened. There is no doubt but what she tried to hire that fellow C. to attack you. They were down at C.'s every day or two when they were here. She sent Buddy frequently." The witness stated that "C." as used by him in the letter meant Mr. Campbell. The persons from whom the witness understood and believed W. T. S. Keller to be in danger were the relatives of Mrs. Keller—Jack Vance, Den Hill, Billy Owens, and Campbell in particular. If an attack upon Keller by the Popes was ever spoken of or suggested by anybody as a possibility the witness never heard a word of it.

Mrs. O. J. Keller, the stepmother of W. T. S. Keller, testified for the defense that W. T. S. Keller and his brother George took breakfast at witness's house on the fatal morning.    Mention was made of the matter to be tried in court on that day.    George Keller, as a witness, asked W. T. S. Keller if he would be needed in court.    W. T. S. Keller replied that he did not think he would, but that if he was needed he would be sent for, and agreed that George should go to his work.

S. R. Perry testified for the defense that at the request of W. T. S. Keller's stepmother he sent word to Jack Vance not to come to court during the proceedings in the Keller case.    This was on the day before the tragedy.    On the same day he told W. T. S. Keller that he had sent word to Jack Vance not to come to town.    Keller asked if Vance had come anyhow.    Witness replied that he had not, and Keller said, "That is good; I am glad of it."

George Keller, brother of W. T. S. Keller, testified for the defense in substance as did Mrs. O. J. Keller.    He further stated that the defendant was a night watchman at the machine shops of the Texas & Pacific Railway.    He worked at night and slept during the day.    The probability of Judge (W. T. S.) Keller being assassinated was a matter often discussed in the family.    Witness did not know from what source the danger was apprehended, but supposed it to be the relatives of Mrs. Keller, who lived in the country about sixteen miles from Marshall.

It was testified for the defense that the defendant had a deputation to carry a pistol, issued to him by the mayor of Marshall.    Defense rested.

J. H. Carter, mayor of Marshall, testified for the State that as such mayor he issued to the defendant a deputation to carry a pistol.    The witness knew the reputation for truth and veracity of the defense witness Joe Keyes.    It was bad.

C. D. Kretz testified for the State that he was present at Adair's interview with W. H. Pope, shortly after the shooting.    Referring to his ink-stained hand, Pope said, "I picked up the inkstand during the shooting with the intention of throwing it, but involuntarily cast it down."    Adair's testimony shows that Kretz was present at the interview.

H. Lewis testified for the State that he arrested the defendant soon after the shooting and took him back to the court house where Major Turner was.    Turner said to the defendant: "You tried to murder me, but you missed it.    You tried to kill all of us."    Defendant replied to Turner, "You are a God damned lying, one-legged son-of-a-bitch."

The State closing, the defendant took the stand in his own behalf.    The sum and substance of his testimony was that he went to the court house from Young's office on the fatal morning, by direction of Young, to be present if needed as a witness.    The Popes were in the crowd that entered the court house in advance of him.    Pending the opening of court the witness left the court room and went to Taughey's store and bought

some tobacco and a little hoarhound candy. On his way back to the court house he stopped in the City Saloon to take a drink. Several parties who were throwing dice asked him to join the game. He declined upon the ground that he was a witness in a proceeding then pending in court, and had to go to the court house. He re-entered the court house and resumed his seat while Mr. Geer was arguing a motion of some kind. He paid no attention to the discussion until he heard W. H. Pope say, in effect, that he was attacking an order of court for fraud—"not fraud of the attorneys, but fraud of the plaintiff Keller." Judge Keller then rose to his feet and said, "That is false." Thereupon W. H. Pope seized a walking stick and threw it end foremost at Judge Keller's head. The witness then looked towards Keller and saw him going down. Witness started to his feet and thought he heard the report of a pistol. He then turned to W. H. Pope, who was standing in front of him, witness, with something in his right hand. It looked bright and "shiny," and witness thought it was a pistol. The witness at that time thought that somebody had shot Keller; that W. H. Pope was going to shoot him again, and so believing, he drew his pistol and began shooting at W. H. Pope.

It was the witness's positive statement that as he saw Keller going down and attempting to draw his pistol he thought that Keller was either killed or about to be killed, and that he, witness, tried to kill W. H. Pope to save Keller's life, and for no other reason. The witness did not see the deceased but once during the transaction, and did not know that he was shot until after the difficulty. He did not hear W. H. Pope say a word to him, witness. At that time he was on good terms with the deceased, with W. H. Pope, and with Major Turner. Neither then nor theretofore had he, witness, anticipated any trouble with the Popes about the Keller divorce suit, though he had been apprehensive of trouble from other sources. The witness was a night watchman and had a deputation from Mayor Carter to carry a pistol, and habitually carried that pistol except to church or visiting. The witness positively denied that he and Keller ever at any time talked about or planned a fight with the Popes. So far as the witness was concerned, such a thing was never thought of. Referring to the matter testified about by Record, the witness said that he directed attention to Jack Nance and said to Record, "There is a man making himself very conspicuous, and such as that will cause somebody to get shot some day." About the time that witness turned to look at W. H. Pope, as Keller was going down, he heard something whiz past his ear. He thought that it was a bullet and that it was fired at him. It became his impression that "they" had Keller down and were trying to "put it to" him, witness, and that if he, witness, did not kill W. H. Pope, Pope would kill Keller. Witness did not, when he fired upon W. H. Pope, know that he, Pope, was unarmed. On the contrary, he would not have fired upon said Pope had he not actually believed that he, Pope, was

shooting at Keller. Deceased did not throw up his hands imploringly before the witness.

The witness stated on his cross-examination that after he was arrested and taken back to the court house, Major Turner, who was still there, said to him, "Dick Weathersby, you tried to murder me, but you failed." This accusation so excited witness that he replied to Turner, "You are a liar." He may possibly have said to Turner, "You are a God damned lying son-of-a-bitch."

The language used in argument by Mr. Duncan, the special prosecuting counsel, referred to in the seventh head note of this report, was as follows: "Gentlemen, you may acquit this defendant—acquit him and these sirens (meaning defendant's attorneys) will sing a very different song to the jury in the other cases against this defendant and Keller. They will argue that the acquittal of Weathersby in this case broke the back of the prosecution, and these defendants (Keller and Weathersby) will go out of the court house unwhipped of justice, and this dastardly murder and this whole bloody tragedy will be unavenged by the law."

The defendant's attorneys objected to these remarks, and Mr. Duncan replied, "I shall say what I please during my argument; you may take the case to the Court of Appeals."

The language of County Attorney McIlwaine, likewise involved in the ruling, was as follows:  "Gentlemen, this is the most damnable conspiracy and the most cowardly murder in the annals of Texas crime, and I thank my God that such foul and cowardly assassinations do not take place in Smith County, but have to be brought here from other counties for trial."

The defendant's application for continuance, the refusal of which constituted one of the grounds of his motion for a new trial, set out that by the absent witness, McKay, he expected to prove that the assault in the first instance was committed by W. H. Pope upon W. T. S. Keller; that said W. H. Pope threw a large and dangerous walking cane at the said Keller; that said cane as thrown was a weapon calculated to inflict serious bodily harm, and perhaps cause death; that W. H. Pope continued to advance upon Keller in a threatening manner from the time he threw the cane until the culmination of the difficulty; that before Keller had drawn or attempted to use his pistol two shots were fired from the direction of the places where W. H. Pope and the deceased were standing, neither of which shots were fired by either Keller or defendant, but, as charged by Keller, by said W. H. Pope; that immediately before the shooting of deceased, and while W. H. Pope was still advancing upon Keller, some person seized Keller and violently threw him, and that at that instant Keller's pistol exploded, inflicting the only and the fatal wound upon the deceased.

*W. P. McLean, W. T. Armistead, W. R. Camp,* and *H. Chilton,* for

appellant.—— 1. The first assigned error in this case relates to the refusal of a continuance to defendant. Diligence in the preparation for trial is clearly shown. The witness McKay was subpœnaed prior to the change of venue from Harrison County, and attached in ample time to have attended the trial in the District Court of Smith County. The reason for his absence is shown to have been a serious sickness which produced physical confinement and inability to travel. The district judge evidently expected, by the use of extraordinary means, to secure the presence of the witnesses before the trial came to an end. Special officers were sent to bring them before the court. These efforts were successful in part, but they totally failed as to witness McKay, the most material of all mentioned in the application. The report of the officer sent out by the court fully confirmed the statement of the application itself that McKay was absent on account of sickness alone.

Was the testimony of McKay material and probably true? There can be no doubt that McKay was in a position to see as much of the difficulty as any other witness in the case; his immediate presence was shown by W. H. Pope; in fact he was one of the four persons whom W. H. Pope was willing to swear remained upon the scene until the trouble was over. It will be noticed that Weathersby testified that a bullet whistled by his head and that he heard what he thought was a pistol shot before he fired at W. H. Pope. This statement of Weathersby himself would have been strongly reinforced by the testimony of McKay if the defendant had been allowed the opportunity to produce it. This was the first application for continuance, and ought, in fairness, to have been granted. Thompson v. The State, 25 Texas Ct. App., 166; McAdams v. The State, 24 Texas Ct. App., 86; Sweet v. The State, 12 S. W. Rep., 590.

2. The next assignment attacks the ruling of the district judge in regard to the formation of the jury. It is very plain that the Revised Statutes of Texas intended to work a reform in the old method of selecting jurors. The policy of giving both to the State and the defendant a list of jurors selected six months before the date of their service, and likely to be distributed throughout the entire county, has been universally commended as one of the most valuable improvements introduced in judicial administration for many years, but if the construction of the court below be sustained the salutary effects of this boasted reform will be entirely defeated. In this particular case the order made by the court at the hour of adjournment on one evening requiring the summoning of a large list of talesmen to be present at 9 o'clock the next morning was practically equivalent to ordering all the talesmen from the immediate locality of the county seat. And why the court should deny the defendant the right to exhaust the jury for the week before taking chances on a list of talesmen thus to be summoned we are unable to understand. Cahn v. The State,

27 Texas Ct. App., 709; Weaver v. The State, 19 Texas Ct. App., 547; Osborne v. The State, 23 Texas Ct. App., 431.

3. The admission of the denunciatory language used by W. H. Pope towards W. T. S. Keller soon after the firing was one of the most damaging episodes connected with the trial in the court below; because in that way the minds of the jury were impressed with a prejudiced view of Keller's conduct towards his wife, and thereby matters which could never have been been brought directly into the case were thrust into a prominence fatal to the impartiality of the trial. The rule of *res gestæ* is a broad and uncertain one, but it seems preposterous to admit under its shield matters of opinion about prior transactions, to which defendant himself was not a party, and about which he would not be even allowed the privilege of offering contradictory testimony. The offered utterances were not those of defendant himself nor even those of Keller; they were remarks made to Keller while probably under arrest, and it is hard to believe that their introduction could serve any purpose except to inflame the jury with the idea that Keller had wronged his wife, and was therefore the manner of man likely to commit a cold blooded murder. 1 Greenl. on Ev., sec. 110; The People v. Davis, 56 N. Y., 102.

4. Under the guise of contradicting C. R. Weathersby the State foisted into the testimony in the court below certain abusive language used by defendant, in which he spoke of Major James Turner as a "damned one-legged son-of-a-bitch." That this testimony could only have a vicious and improper influence upon the case is shown by the fact that counsel for the prosecution used it before the jury as one of their strongest evidences of defendant's guilt; and the District Court permitted this impression to fasten upon the minds of the jury by failing to limit the purpose of the testimony in the charge. It should be remembered that these terms of reproach were used after Weathersby had been arrested, and so long after the transaction that there is no pretense of their admissibility except to impeach Weathersby himself. His counsel objected to such a departure from the main issue. Weathersby did not deny the language attributed to him. There was therefore no predicate for his contradiction, and to permit the State to prove the same thing by other witnesses gave to the language of Weathersby an importance which counsel used against him with terrible effect. Gonzales v. The State, 12 S. W. Rep., 733; Huffman v. The State, 12 S. W. Rep., 589; The People v. Brown, 72 N. Y., 571; Drake v. The State, *ante*, —; Drake v. The State, 25 Texas Ct. App., 293; Williams v. The State, 25 Texas Ct. App., 76.

5. If there ever was a case that called for a charge upon manslaughter more strongly than the case at bar, we have failed to notice it in the books. There are three or more distinct theories of the evidence which would make the case manslaughter and nothing higher. It should be remembered that the issue of the accidental killing of Alexander Pope is clearly

raised by the testimony. Indeed, that theory is recognized in the charge of the court as one fairly arising from the facts. But after giving defendant the benefit of the theory as appliable to the question of absolute guilt or innocence, the court totally fails to apply that theory to the question of the degree of guilt. Every line of the testimony demonstrates (and no contradictory view has ever been advanced by the State) that the shot fatal to Alexander Pope's life was not fired by defendant Weathersby but by Keller. If Weathersby is to be found guilty of Keller's crime by relation or construction, or as an aider and abetter, he can of course be found guilty of no higher crime than that of the principal offender. From this standpoint let us analyze for a moment Keller's conduct and state of mind. There is much testimony tending to show that W. H. Pope struck Keller with the stick, which was, from the description contained in the record, surely such a weapon as would cause pain, and if so, the killing of W. H. Pope by Keller would not have constituted a higher grade of homicide than manslaughter. If Keller, in thus resenting an assault and battery upon him, accidentally killed Alexander Pope, his offense would be reduced to that degree which would have resulted if he had killed the man he shot at, and Weathersby's guilt in co-operating with Keller would fall to the same degree.

There is still another theory which, under the circumstances, would reduce the offense to manslaughter. A reading of the statement of facts in this case will show that the killing took place while all of the parties were in a terrible state of confusion; the court house was full of spectators, many of them women and children; the smoke settled in the corner of the room where Keller stood; officers rushed upon him. It is shown that his pistol went off one or more times while he was trying to adjust the cylinder to it; and it is highly probable that in the melee there was produced in his mind such a degree of terror that he was rendered incapable of cool reflection. If such was his mental condition, and if the circumstances were such as would have commonly produced this effect, his offense would have been manslaughter only; and this would be so whether the killing of Alexander Pope was accidental or not.

There is a third theory of manslaughter which possesses special importance in view of the argument by the State that Keller brought on the difficulty with W. H. Pope for the purpose of obtaining a pretext to kill him. Suppose the contest was provoked by Keller, but without any apparent intention of killing or doing serious bodily injury, and W. H. Pope carried his resentment beyond the reasonable limits which may have been contemplated by Keller, but not far enough to entitle Keller to absolute justification. In such a case, though Keller may have been so far blameworthy as to defeat the plea of self-defense, his guilt would be reduced to the offense of manslaughter. Varnell v. The State, 26 Texas

Ct. App., 56; Bonnard v. The State, 25 Texas Ct. App., 178; Gonzales v. The State, 12 S. W. Rep., 733.

And this failure of the court to submit the issue of manslaughter to the jury in any phase whatever, it seems to us, constituted the most conspicuous, radical, and inexplicable error in the proceedings below. It has been often stated by this court that when the evidence, however inconclusive, tends to prove facts from which the jury may reach a finding of manslaughter, or where the evidence raises a doubt as to whether the homicide be of so high a grade as murder, that the court should submit the issue of manslaughter.

6. A charge on circumstantial evidence was imperatively demanded upon the trial of the issues involved under the indictment against Weathersby for the murder of Alexander Pope. If this was a prosecution against Weathersby for an assault with intent to murder W. H. Pope or James Turner the case would not depend on circumstantial evidence alone. But when you test Weathersby's complicity in the killing of Alexander Pope there is not one grain of inculpatory testimony, except that known in the books as circumstantial. Compare the theories of the State and the defendant. The State says that Keller and Weathersby conspired together to murder the Popes; that in furtherance of their conspiracy both were present at the trial of the divorce case; that both were armed; that they had picked the man that each should slay; that Weathersby shot at his man, W. H. Pope, and failed to kill him; that Keller shot at his man, Alexander Pope, and took his life. The opposing theory is that Keller was armed because he had been threatened with assassination, and had come from a distant county to attend a trial; that Weathersby was armed because of his office as a policeman, and was present because he was a witness on the trial; that the rencounter between W. H. Pope and Keller was totally unforeseen by the parties, and that Weathersby shot at W. H. Pope to save Keller from death or serious bodily injury, as he supposed, and that he acted upon an instantaneous impulse, and not from any preconcert with Keller. Now apply the testimony to the State's theory. In the first place, is there any direct proof of a conspiracy? It may be said that the two defendant's were brothers-in-law; that they were seen together on that morning; that they went out of the court room once or twice before the homicide; that they were both armed. But these things are but circumstances from which a conspiracy is inferred by the prosecution. Again, that Weathersby shot at W. H. Pope; that he shot immediately after the difficulty began; this is positive testimony to show that Weathersby assaulted W. H. Pope, but it is only presumptive or circumstantial when it is used to show that he aided or conspired to bring about the death of Alexander Pope. There is not in this extensive record one syllable to show that Weathersby ever had any hostility toward Alexander Pope, or that he even knew that Alexander Pope was in the difficulty until after its ter-

mination. Turn the testimony as you may, and at last the argument of the
State's counsel resolves itself into this:   That because of certain things
done by Weathersby before the difficulty, and certain offensive acts of his
during the difficulty towards W. H. Pope, they therefore infer that he par-
ticipated in the offensive act of Keller against Alexander Pope.     Harris
v. The State, 15 Texas Ct. App., 629.

7.    Though the court recognizes the theory of the accidental killing of
Alexander Pope, it was put in such a way in the charge as to practically
amount to nothing.     It is stated as follows:

"If you believe from the evidence that W. T. S. Keller shot and killed
Alexander Pope accidentally—that is, that there was no intention nor de-
sign to take his life or murder W. H. Pope—then defendant would not be
guilty, and you will acquit."

This charge would be understood by an ordinary juror to mean that if
Keller did not intend to kill either of the Popes Weathersby would not
be guilty.    Of course it was a fact admitted by the defendant that Keller
intended to kill W. H. Pope.     The court no doubt intended to convey the
idea to the jury that if Keller accidentally shot Alexander Pope while he
was committing an assault upon W. H. Pope, under circumstances which
if W. H. Pope had been killed would constitute murder, then he would
not be entitled to an acquittal, although Alexander Pope was accidentally
killed.     And if he had gone on in any other part of the charge to show
the jury under what circumstances the accidental death of one man in an
attempt to murder another became itself murder, then the charge, although
misleading, would have been rendered less objectionable.     But this view
of the case is not analyzed in any other part of the charge, and as put in
this form must have had a fatal influence upon defendant's rights.    Our
exceptions failed to induce a correction or elaboration of this feature of
the charge.     We confidently believe that there can be no guarantee that
the jury ever had a proper conception of defendant's rights in case the
killing of Alexander Pope was believed by them to be accidental.    Ordi-
narily a jury would promptly return a verdict of not guilty if they believed
a man was accidentally killed.     But there was so much in this case to
lead them off from the trial of the particular indictment read to them; so
much to confuse the issues with those involved in the other cases for the
shooting at W. H. Pope and James Turner; so much to arouse their pas-
sions in the argument of counsel for the State and the visible partiality of
the bystanders, and so little to justify their verdict on the naked facts of
the case, that it can hardly be presumed that they took the time or trouble
to draw the distinction between "kill" and "murder" as used in that
part of the charge to which we have just referred.

8.    The argument of Mr. Duncan for the prosecution was characteris-
tically shrewd.    This will not be the first case in the Texas Reports which
records his power in that direction.    He perceived the weak point in the

prosecution. With his instinctive judgment he realized that the case must be strengthened there or it would fail. This accounts for the objectionable remarks of his closing speech. He stated to the jury that:

"Gentlemen you may acquit this defendant; acquit him, and these sirens (meaning defendant's attorneys) will sing a very different song to the jury in the other cases against this defendant and Keller. They will argue that the acquittal of Weathersby in this case broke the back of the prosecution, and these defendants (Keller and Weathersby) will go out the court house unwhipped of justice, and this dastardly murder and this whole bloody tragedy will be unavenged by the law."

The defendant objected to these remarks, and Mr. Duncan replied, "I shall say what I please during my argument; you (defendant's attorneys) may take the case to the Court of Appeals."

Our effort from the beginning was to disentangle the question of Weathersby's guilt for the killing of Alex. Pope from Keller's guilt under the same charge, and to rid the minds of the jury of the impression that their verdict in this case constituted a factor in the decision of the other cases. We were entitled to have this case stand on its own merits, but it was a fight against the current from the beginning (on account of the way in which the difficulty happened) to hold the jury to the issue of Weathersby's guilt for the death of Alexander Pope. This closing speech of the prosecution swept away all our labors, and did a damage to the defendant which we think produced this conviction. The reproof by the court was so mild that it perhaps added to the significance of counsel's argument, rather than saved defendant from its injurious effects.

The remarks made by County Attorney McIlwaine materially prejudiced the rights of this defendant. The counsel referred to the change of venue from Harrison County to Smith County, and appealed to the pride of Smith County in such a way as to arouse the prejudice of the jury against Weathersby and provoke applause from the audience, citizens of Smith County. This applause showed the jury that the public was arrayed against the defendant, and the jury, being citizens of Smith County, sympathized with the crowd and caught their enthusiasm, and were thereby led away from the facts of the case and hurried into a conviction. If counsel for the prosecution can be permitted to denounce a defendant for having committed "such a damnable conspiracy and cowardly murder" in Harrison County, and "such as has never been committed in Smith County," etc., the change of venue from Harrison to Smith resulted in an aggravation of the prejudice against him instead of securing for him a fair and impartial trial. Notwithstanding the district judge rebuked the applauding crowd, the effect of such applause was not neutralized thereby, and the influence it had on the minds of the jury can never be known, even by themselves. If such conduct is to be tolerated in a court of justice, it would soon become a question in a trial for a capi-

tal offense which side could muster the greater number of clacquers, with the loudest lungs and nimblest feet and hands, to test the defendant's guilt or innocence, instead of following the well established forms of law, uninfluenced by outside pressure. It will also be noticed that while the judge rebuked the crowd for applauding the sentiments uttered by County Attorney McIlwaine, he failed to check or rebuke him for alluding to the change of venue, and what he said about that was left unchallenged before the jury.

*W. L. Davidson*, Assistant Attorney-General, and *J. M. Duncan*, for the State.—The motion for new trial, based upon the court's refusal to grant a continuance for the testimony of McKay, was properly overruled. The facts expected to be proved by said McKay are not probably true, and the record so proves. Nowhere is it shown that McKay would swear to said facts. Geer's evidence, Alex. Pope's testimony, defendant's own evidence, W. H. Pope's testimony, and in fact the whole mass of testimony makes it apparent that if McKay, or anybody else, ever touched Keller from the beginning to the termination of the tragedy it was subsequent to the shooting of Alex. Pope. Defendant himself swears that he heard a pistol shot, and that a ball or something whizzed by his head from Keller's position before McKay started towards Keller. Nobody shot except Weathersby and Keller. McKay could not testify to its being an accidental shot. He could testify, if it were a fact, that Keller was caught and thrown around, and had a cocked pistol in his hands and fired it, and that Alex. Pope was shot, but he could not say it was accidental, because it would be mere matter of opinion and conclusion, and one contradicted by all the facts in the case. Then it is not probably true that McKay would or could so testify, and the facts show that Keller was not seized nor caught till after Alex. Pope was shot.

When the facts stated in the application for continuance are considered with the evidence adduced on the trial, and do not appear to be material or probably true, a new trial because of the refusal of the continuance should not be granted. Cunningham v. The State, 20 Texas Ct. App., 162; Collins v. The State, 24 Texas Ct. App., 141; Milton v. The State, 24 Texas Ct. App., 47; Parker v. The State, 24 Texas Ct. App., 61; Henning v. The State, 24 Texas Ct. App., 315; Hennesey v. The State, 23 Texas Ct. App., 340; Rice v. The State, 22 Texas Ct. App., 654; Willson's Crim. Stats., sec. 2186.

Again, if the defendant could produce, and failed to do so, the same testimony as is absent, he cannot complain that the continuance was overruled. Wooldridge v. The State, 13 Texas Ct. App., 443; Nolan v. The State, 14 Texas Ct. App., 474.

If this testimony had ever been produced from the said witness it could have been reproduced on the showing that he was sick. Collins et al. v.

The State, 24 Texas Ct. App., 141.    The proper predicate was laid or could have been laid, as shown by the bill of exception.

Again, the testimony if produced could not have affected the result. As before stated, the witness could not swear that Pope was accidentally shot.    Such testimony would be but an opinion, and one that would be wholly inadmissible if objected to.    The fact that Keller was turned round would be wholly immaterial.    Willson's Crim. Stats., sec. 2165; Fernandez v. The State, 4 Texas Ct. App., 419; Chaplin v. The State, 7 Texas Ct. App., 87;  Hildreth v. The State, 19 Texas Ct. App., 195; Frye v. The State, 7 Texas Ct. App., 94.    Such provable facts as are stated as expected to be testified by McKay are entirely consistent with defendant's guilt and could not affect the result.

Again, it is urged that the application and diligence are both wanting. Every witness was present whose names are set out in the application save McKay, and he was too sick to attend court.    Where depositions can be taken, and are authorized to be taken, it constitutes a failure of diligence that said depositions are not sought nor taken.    If the witness had already testified on the *habeas corpus* trial his testimony could be used.    Collins et al. v. The State, 24 Texas Ct. App., 141.

Again, the application for the continuance is fatally defective in failing to allege therein whether the same was the first or a subsequent one, and the bill of exceptions fails to show whether it was the first, or second, or a third application for continuance.    Everything must be made manifest by the bill of exceptions that is required to show the error complained of; otherwise the bill is deficient.    Willson's Crim. Stats., sec. 2368.    This court will not look to other portions of the record to supply omissions in the bill of exceptions.    Neither will this court infer from the allegations of the application that the motion to continue is the first application, because such inference would reverse the rule that the "rulings  *  *  * of a court are correct till shown to be the contrary;" that every presumption is in favor of the correctness of the trial court's ruling, and not against it.    The application for continuance and the bill of exceptions are totally deficient in this respect, and this court will not aid their defects by indulging in inferences and presumptions against the judgment on this appeal.    The bill must show whether this was the first or a subsequent application.    This question came up and was decided by our Supreme Court adversely to the defendant in Arnold v. Hockney & Bro., 51 Texas, 46.

But such is the effect of all the long line of decisions rendered by this court, as collated by Judge Willson in his Criminal Statutes, section 2368, as well as by an unbroken line of decisions rendered by the Supreme Court of Texas.    Therefore the bill of exceptions ought not to be considered.

Within fifteen or twenty seconds after the shooting of W. H. Pope and Alex. Pope by the defendant and Keller, said W. H. Pope remarked to

Keller that he, Keller, had murdered Major Turner and Alex. Pope and shot him, W. H. Pope, all to pieces, and had brought in his "ruffianly brother-in-law" to do said murder (referring to defendant). This was objected to because Keller was under arrest, and said remarks were made to him when Weathersby was not present, after the termination of the common enter-prise. This testimony was legitimate and proper. It was made at the time and place of the shooting, and in so short a time thereafter that it is clearly *res gestæ.* Willson's Crim. Stats., sec. 1046; Powers v. The State, 23 Texas Ct. App., 42; Thompson v. The State, 19 Texas Ct. App., 593; Kennedy v. The State, 19 Texas Ct. App., 618; Colquitt v. The State, 34 Texas, 550; Cox et. al. v. The State, 8 Texas Ct. App., 255; Tooney v. The State, 8 Texas Ct. App., 452; Stagner v. The State, 9 Texas Ct. App., 440. The presence or absence of a defendant, or his being under arrest, is im-material upon the question of the admission of *res gestæ* evidence. Pow-ers v. The State, 23 Texas Ct. App., 42; Booth v. The State, 4 Texas Ct. App., 202; Foster v. The State, 8 Texas Ct. App., 248; Neyland v. The State, 13 Texas Ct. App., 536; Washington v. The State, 19 Texas Ct. App., 521; Willson's Crim. Stats., sec. 1046.

The third bill of exception is too vague and indefinite to be considered by the court. The bill recites that defendant and one Lewis were per-mitted to testify that defendant said to Major Turner, in response to the Major's reproaches that defendant had attempted to murder him, that he, Turner, was "a damned lying one-legged son-of-a-bitch," the objection being that defendant "could not be contradicted by his own statements when under arrest, and because same did not contradict Weathersby, but was calculated only to prejudice the jury against him."

We would ask, upon the face of this bill, who brought out said testimony? Did the State bring it out? Did the defendant bring it out? Was it an unexpected reply to some question asked by the defendant? Was it sought by the State on cross-examination of Weathersby and Lewis? The bill does not show anything about these matters. Presumption must be re-sorted to to supply this inherent weakness in the bill, and this can not and will not be done by this court. Willson's Crim. Stats., sec. 2368.

Again, touching the objections urged, what is there in the bill showing that defendant was contradicted by his own statement? If so, what state-ment was he contradicted by, and what statement of his was contradicted by himself? Was it some other statement he may have made previously? There is nothing in the bill that makes any contradiction appear.

The second objection is that said statement does not contradict defend-ant. The bill is silent on this point, too.

The two objections are not very intelligible when put face to face, the first being that defendant can not be contradicted by his own statement, and the second being that he was not contradicted by his own statement. Thus they are presented by the bill. These objections are not established

nor their validity made to appear. This must be done. The judge's authentication of the bill does not establish the validity of the grounds of exception, but merely certifies its presentation to him and his disposition of it. Hennessey v. The State, 23 Texas Ct. App., 340; Smith v. The State, 4 Texas Ct. App., 626.

Again, the bill does not show when or where Turner and defendant had the conversation referred to. Was it immediately after arrest of the defendant or a week afterwards? And where was it? If we are to indulge in presumption at all, this court will presume the court did right in the rulings on this and every other question. This is fundamental. The defendant has not made manifest any error. This court will presume that there was none. Willson's Crim. Stats., sec. 2368.

From the remarks indulged in by Turner and defendant it is presumed that the conversation occurred shortly after the shooting, when both had had no time for reflection and were still excited and were making spontaneous, vicious remarks. If so, we presume in aid of the ruling of the court that it was *res gestæ,* even if defendant was under arrest, and it will be presumed also that the State introduced it in evidence. Powers v. The State, 23 Texas Ct. App., 42.

Of course the whole thing must be presumed in order to give the bill any standing at all.

The fourth bill of exceptions shows that the special venire had been exhausted, and that the court ordered the sheriff to summon talesmen from the body of the county. The defendant moved that the jury for the week be placed in the box to be drawn from, and this the court refused to do. The sheriff proceeded to select fifty talesmen as directed. There were seven jurymen in the panel for the week who had been previously selected by the jury commissioners, and the remainder had been summoned by the sheriff from the county at large. The error alleged is that the court refused to place the jury for the week in the box to be selected from. No complaint is made that a fair jury was not obtained. They virtually concede that. It was not asked that the seven jurors selected by the jury commissioners be placed in the box to be drawn from, and the defendant can not complain that this was not done, because he did not ask it. He waived it, and does not now complain of that failure.

The Roberts decision (5 Texas Court of Appeals, 141) was rendered prior to the revision and before the enactment of article 611 of the Code of Criminal Procedure. That article requires the court to order the sheriff to summon a sufficient number of jurors to make out and complete the venire, and it also requires the jurors selected by the commissioners to be first economized. Article 612 of the said code provides that when a jury has not been selected from the venire, then the court shall order the sheriff to summon a sufficient number of talesmen to complete the venire, or a sufficient number out of which the defendant shall select the remainder of

the jury who shall try him, the number being specified by the court. Code Crim. Proc., arts. 611, 612, 615.   Weaver's case, 19 Texas Court of Appeals, 547, and Cahn's case, 27 Texas Court of Appeals, 709, are not in point; nor are those cases analogous to this case.   In Weaver's case, after exhausting the venire, the jury for the week was ordered by the court to be drawn from, but the entire panel had been regularly drawn for jury service by the jury commissioners and not selected by the sheriff as talesmen.   In the Cahn case the same state of case existed; and besides this, only thirty-three jurors had been summoned on the special venire.   The decision in each case shows the above state of facts to have existed.

A trial court can in no case summon talesmen or jurymen of any kind. The jury commissioners select the jurors for the term, and these are summoned by the proper officers provided for by law.   When these jurors fail or are exhausted, and others are needed as talesmen, these latter are required to be selected by the sheriff.   Rev. Stats. art. 3056; Code Crim. Proc., art. 615.

The only theory upon which a trial court can order the panel for the week to be economized in cases where special venires are required and have been exhausted, is based upon the fact that the said jurors have been previously selected by the jury commissioners.   They are the jurors for the term because of their previous selection for that important duty by the said commissioners.   When these have been exhausted there are no jurors until a selection has been made by the proper officer through the channel pointed out by the law, and this is required of the sheriff.   The bill of exception shows that there were only seven of the jurors for the week who had been selected by the jury commissioners on the panel for the week.   The others had been supplied in some other way.   The court could not order them into the box as a whole, because, legally speaking, the court has no authority to summon talesmen.   Conceding that the court could have placed the seven men who had been previously selected by the jury commissioners into the list to be drawn from, it would not follow that it could order talesmen summoned by the sheriff to do jury service for the week into the box to be selected from, or to be placed in the lists to be drawn from in a special venire case.   Our laws confer no such authority on the court.   The defendant did not ask that the seven men selected by the jury commissioners be tendered him to pass on.   He only asked that the entire panel for the week be given him to select from. There was no error shown to have been committed by the court in this ruling.   Code Crim. Proc., arts. 611, 612, 615; Rev. Stats., art. 3056.

The fifth bill of exceptions reserves numerous exceptions to the charge as given by the court.   We submit that there is no error in any of them. We will not discuss any of them save the exception reserved to the court's failure to charge manslaughter.   Before manslaughter can be contended for, it should be shown that "adequate cause" existed; that the "ade-

quate cause" produced the "sudden passion;" that the "sudden passion" actually existed; that Alex. Pope was the occasion of the passion, and that it was directed at him.    That the sudden passion may have been directed at and against W. H. Pope will not suffice under the facts of this case. This record wholly fails to show any adequate cause as to Alex. Pope, so far as defendant is concerned.    If Alex. Pope was killed in pursuance of a previously formed design to kill him, or to kill the two Popes, or the two Popes and Major Turner by defendant and Keller, as contended for by the State, then it is clear that the killing is murder.    It will not matter what brought it about; if that state of facts actuated defendant to kill either of said three parties it would be murder.    If Keller provoked the difficulty for the purpose of killing either of said parties, and defendant was in any way a principal to that design and assisted in its execution, he was guilty of murder.    Defendant's theory upon which he rested his case was that there was no such design, and that he only shot at and sought to kill W. H. Pope for the purpose of saving Keller's life, and that he knew nothing of the shooting of A. Pope until after he was in jail, and that he didn't know that said A. Pope was in the trouble in any way until the difficulty was all over.    These issues are sharply defined, and there is no middle ground for the inferior grade of homicide produced by "adequate cause."

In questions of self-defense, either perfect or imperfect, we must look at the case from the standpoint of defendant as it appears to and was understood by him in presenting the issues of the case.    This is fundamental in this State.    If the surroundings are viewed as defendant viewed them then there can be no question of manslaughter raised in this case.    No testimony in the record shows that A. Pope was making any hostile demonstration towards defendant or Keller, but on the contrary it is affirmatively shown that he was pleading with Keller for the life of his brother, W. H. Pope, when Keller shot him to death.    Defendant, testifying with reference to this phase of the case, said he did not know that Alex. Pope was in the difficulty or that he was shot, and never heard of it until after he, defendant, was placed in jail.    All of defendant's shots were directed at W. H. Pope, none of them at Alex. Pope.    The defendant testified to these matters.    He, defendant, said on his examination as a witness, "I thought Bill Pope was going to shoot Keller; thought some one else had shot at him first."    Again, he says, "I thought they were killing him or going to kill him, and I tried to kill Bill Pope to save Keller's life, and for no other reason.    I am talking of Bill Pope.    I never saw Alex. but once during the whole thing, and did not know he was shot."    Again, he swears that "I never fired at A. Pope at all; I fired at no one except W. H. Pope.    I did not know that Alex. was in the difficulty at all; did not know he was hurt until I was told so while in jail."    Again, he swears in this language: "I shot Bill Pope because I thought Keller was shot; that

was the only reason on the earth for me shooting him.　*　*　*　A second or two afterward I thought he had shot Keller and was going to shoot me.　All I know is I was trying to kill him because I thought he had shot Keller."　Throughout his evidence he is emphatic that he was only shooting at W. H. Pope for the purpose of saving Keller's life and to prevent anticipated danger to himself from said W. H. Pope.　He as emphatically disclaims any feeling at or against Alex. Pope.　This is his view of the killing of Alex. Pope.　His theory was self-defense as to W. H. Pope, and non-participation in the killing of Alex. Pope either in fact, by concert of action, intent, or knowledge, and to it he testifies vehemently, whether real or feigned.　He presents the case as he desired the jury should view it from his standpoint.　He testifies to no single fact nor group of facts that makes or tends to show any phase of manslaughter, nor any ground for sudden passion produced by adequate cause, and the record as a whole shows none.　Then this case presents generally two theories, both sharp, well defined, and incisive—one of murder and the other of self-defense and non-participancy in the act or intent.　These were fully presented from the defendant's standpoint.　The court went still further and presented the question of accidental homicide of A. Pope.　This was not warranted nor called for by the facts of the case; but defendant can not complain, because it was favorable to him.

The case is murder or not guilty.　Green v. The State, 27 Texas Ct. App., 244.　Defendant's case for shooting at and wounding W. H. Pope is not under discussion here, and it is not necessary under the facts to do so on this phase of the case.

If Keller killed Alex. Pope accidentally, then it is apparent that defendant could not be guilty of manslaughter, nor of any grade of homicide, and a charge on manslaughter on this theory would have been fatal error.

If Alex. Pope was killed by Keller without a previously formed design to do so between defendant and Keller, and defendant had no knowledge or guilty participancy in the killing, and knew nothing of it until after it was over, and was not guilty as a conspirator to do the killing of the Popes, he would not be responsible for the death of Alex. Pope, much less guilty of manslaughter.　From this standpoint manslaughter should not have been charged.

If defendant shot W. H. Pope to prevent him from killing Keller or himself (defendant), and not in aid of Keller killing A. Pope, defendant would not be guilty of manslaughter.

If defendant's and Keller's minds, intents, purposes, and acts did not meet in unison and oneness of purpose in the killing of A. Pope, then defendant was not guilty of manslaughter nor of any offense.　There is no middle ground between the State's theory of previously formed design between Keller and defendant to kill the Popes, and the theory of de-

fendant that he was not only not guilty of such design, but was absolutely ignorant of all designs, especially at and towards Alex. Pope. There is nowhere in the record any lodgment for a question of manslaughter on the facts. Keller's attitude and defendant's attitude to the killing of Alex. Pope is the same as to murder, or it is nothing. Keller, under defendant's theory of the case, killed Alex. Pope without even defendant's knowledge of such killing. He was ignorant of the whole transaction. Then how could he be guilty of manslaughter? If the State's case is correct he is guilty of at least murder in the second degree. Green v. The State, 27 Texas Ct. App., 244. If defendant's theory is correct, he is not a guilty participant in the death of Alex. Pope.

The comments of counsel show no injury. Before a conviction will be set aside for alleged improper remarks made by counsel for the State in argument, it must appear that the said remarks were not only improper but that they were of a material character, and such as, under the circumstances of the particular case, were calculated to injuriously affect the defendant's rights. House v. The State, 19 Texas Ct. App., 227; Pierson v. The State, 18 Texas Ct. App., 524; Bass v. The State, 16 Texas Ct. App., 62; Willson's Crim. Stats., sec. 2321.

No special charge was asked with reference to the remarks complained of, and a conviction will not be set aside for this cause unless the defendant requested and was refused an instruction directing the jury to disregard the unauthorized statements of counsel for the State. Young v. The State, 19 Texas Ct. App., 536; Kennedy v. The State, 19 Texas Ct. App., 618. In regard to latitude allowable to the argument of counsel, the trial judge is vested with large discretion, which will only be revised when obviously abused. Bingham v. The State, 6 Texas Ct. App., 169; Hudson v. The State, 6 Texas Ct. App., 565; Foster v. The State, 8 Texas Ct. App., 248; Cross v. The State, 11 Texas Ct. App., 84.

WILLSON, JUDGE.—It is made to appear by a bill of exception reserved by the defendant that after the special venire had been exhausted without completing the jury, the defendant moved the court to have the jury for the week, as selected by the jury commissioners, called and tried as jurors before the sheriff should be authorized to summon talesmen from which to complete the panel. There were seven of said jurors for the week present who were not on the special venire already exhausted. The court refused said motion, and ordered the sheriff to summon talesmen from the body of the county, which order was obeyed by the sheriff, and from the talesmen so summoned the panel was completed.

It does not appear from the bill of exception that the jurors selected for the week by the jury commissioners were not summoned as talesmen by the sheriff, and that the jury was not completed from said regular jurors. To entitle the defendant to complain of the action of the court

overruling his motion, although said action might be erroneous, he would have to show further that because of said action he was deprived of a legal right; that is, if he had a legal right to select jurors from the jury selected by the jury commissioners, he would have to show that this right was not accorded him in fact, and that by the action of the court a juror or jurors were forced upon him who had not been selected by the jury commissioners. We hold, therefore, that if it was the defendant's right to select from the regular jurors before being required to select from talesmen not regular jurors, his bill of exception fails to show that he was deprived of his right, and therefore fails to show any reversible error.

But we are of the opinion that the court did not err in refusing the defendant's motion. There are decisions of this court holding to the contrary; that is, holding that when a special venire has been exhausted without completing the panel the regular jurors selected by the jury commissioners should be exhausted before resorting to talesmen summoned by the sheriff. Cahn v. The State, 27 Texas Ct. App., 709; Weaver v. The State, 19 Texas Ct. App., 547. These decisions follow the decision in Roberts v. The State, 5 Texas Court of Appeals, 141. That decision was made prior to the revision of the Code, when there was no statutory provision directing the procedure after the special venire had been exhausted. Article 612 of the Code of Criminal Procedure was added by the revisers, and it provides as follows: "When from any cause there is a failure to select a jury from those who have been summoned upon the special venire the court shall order the sheriff to summon any number of persons that it may deem advisable for the formation of the jury."

This article does not require that the persons to be summoned shall be those who have been selected as jurors by the jury commissioners. It contains no such qualification, either expressly or impliedly. It is precisely applicable to the state of case with which the trial judge was confronted, and his ruling was plainly in accord with it.

In the Weaver and Kahn cases, *supra*, we were doubtless misled by the Roberts case, and did not have our attention called to article 612. We are now satisfied that upon the question under consideration our decisions in the Weaver and Kahn cases are wrong, and they are overruled.

With respect to the testimony detailing W. H. Pope's statements made to Keller, as recited in defendant's bill of exception No. 2, we are of the opinion that it was competent and admissible. Pope's statements were in our opinion *res gestæ* of the homicide. They were made in a few seconds after the shooting had ceased, and under such circumstances as constituted them a part of the transaction. Whatever is said by any party to the transaction at the time of the transaction is a part of the transaction itself, and is admissible in evidence as *res gestæ*. Thompson v. The State, 19 Texas Ct. App., 593; Kennedy v. The State, 19 Texas Ct. App., 618; Powers v. The State, 23 Texas Ct. App., 42. Pope's

statements being *res gestæ* were not rendered incompetent evidence by the facts, if such were the facts, that at the time they were made Keller was under arrest and the defendant was not present.

It was not error to admit the testimony as to the conversation which occurred between defendant and Major Turner soon after the homicide. The declarations and conduct of a defendant, either before or after the offense, are admissible evidence against him, as evidence indicating the intent and motive which actuated him in the transaction with which he is charged, although such declarations may not be *res gestæ* of such transaction. Langford v. The State, 17 Texas Ct. App., 445; Cordova v. The State, 6 Texas Ct. App., 207; Handline v. The State, 6 Texas Ct. App., 347; Hart v. The State, 15 Texas Ct. App., 202. No statements made by the defendant in said conversation involved any confession of guilt, and hence his statements were not rendered incompetent evidence because he was under arrest at the time the same were made. The rules governing the admissibility of confessions are not applicable to any statement of the defendant admitted in evidence against him.

In his charge to the jury the learned judge submitted the issues and the law of murder in the first and second degrees, of homicide by accident, and of self-defense. He did not submit the issue of manslaughter. Defendant excepted to the charge because it did not submit the issue and the law of manslaughter, and requested instructions upon that issue which the court refused to give, and this action of the court is presented by bills of exception, and is earnestly insisted upon by defendant's counsel as error for which the conviction should be set aside.

As we understand and view the evidence in this case it does not present the issue of manslaughter. This is a prosecution for the murder of Alexander Pope. All the evidence shows that no provocation was given by Alexander Pope to either Keller or the defendant. On the contrary the evidence is uncontradicted and conclusive that at the time Alexander Pope was shot by Keller he had his hands raised imploringly, and was beseeching Keller to not shoot. Alexander Pope at no time and in no manner gave the slightest provocation to Keller or to the defendant. All that he did was to endeavor by gentle persuasion to prevent Keller from from shooting W. H. Pope, his brother. To reduce murder to manslaughter the homicide must have been committed "under the immediate influence of sudden passion;" and by this is meant that there must be a provocation to cause passion, which provocation must arise at the time of the commission of the homicide, and must not be the result of a former provocation, and the act must be caused directly by the passion arising out of the present provocation, and the provocation must be one given by the party killed, and not one given by some other person. Penal Code, arts. 593, 594.

Defendant's counsel argue that the theory of accidental homicide is in

the case; that there is evidence tending to show that Keller shot and killed Alexander Pope accidentally while attempting to shoot W. H. Pope, and that this theory involves and raises the issue of manslaughter. We have read and searched the record in vain for any testimony which tends to support the theory that Alexander Pope was shot accidentally by Keller. As we understand from the evidence the position of the parties at the time of the shooting, a shot fired by Keller at W. H. Pope would have gone wide of the mark had it hit Alexander Pope. We think the evidence overwhelmingly shows that Keller shot Alexander Pope intentionally— that is, intending to shoot him, Alexander Pope, and not intending to shoot W. H. Pope. It is true that the learned trial judge instructed the jury upon the theory of the accidental killing of Alexander Pope, but we think the instruction was not demanded or even authorized by the evidence and should not have been given, but the instruction being favorable to the defendant is not error of which he can, nor does he complain.

Another objection made to the charge of the court is that it does not instruct on circumstantial evidence. This objection is answered by the fact that the inculpatory evidence is not wholly circumstantial, but on the contrary the evidence as to the entire transaction is direct. It is true that the evidence relied upon by the State to prove that Keller and the defendant acted together in the commission of the homicide in pursuance of a previously formed and common design is circumstantial, but it is only where the inculpatory evidence is wholly circumstantial that instructions upon that character of evidence are required to be given.

What we have said in relation to the charge of the court disposes of other objections made to it, and to which we will not therefore specifically refer. The main charge of the court was largely supplemented by instructions given at the request of the defendant, and considering all the instructions together we think the charge is a full, lucid, and correct presentation of the whole law of the case.

Bills of exception to remarks made by counsel for the State in their arguments to the jury were reserved by the defendant; also showing by one of said bills that the audience applauded some of the remarks made by one of the State's counsel in his address to the jury. With respect to the applause, it was promptly suppressed and severely rebuked by the court, and it is not made to appear to this court that the applause, the character and extent of which is not shown by the bill of exception, had, or was even calculated to have, any influence upon the jury prejudicial to defendant. Cartwright v. The State, 16 Texas Ct. App., 473. As to the remarks of counsel for the State recited in the bills of exception, we think they were improper and should not have been made; but they were not, as we think, of a material character, calculated to affect injuriously the defendant's rights; nor did the defendant request of the court any instructions directing the jury to disregard such remarks.

Young v. The State, 19 Texas Ct. App., 536; Kennedy v. The State, 19 Texas Ct. App., 618; House v. The State, 19 Texas Ct. App., 227; McConnell v. The State, 22 Texas Ct. App., 354.

In his application for a continuance, which was refused by the court, the defendant stated that he expected to prove by the absent witness McKay that two shots were fired before Keller drew his pistol, one of which shots was fired from the direction of where W. H. Pope was standing, and towards Keller, which shot was not fired by either Keller or defendant; that while Keller was standing with his pistol in both hands, looking in the direction of W. H. Pope, who was advancing upon him, he was violently thrown around by some one in the direction of Alex. Pope, when his pistol was discharged, which shot killed Alex. Pope. It can not be questioned that this testimony would be material, but we are clearly of the opinion that the facts set forth in said application in relation thereto are not probably true. These facts are not only uncorroborated by, but are contrary to the testimony of numerous eye witnesses to the transaction, who had as good, if not better, opportunity of seeing, hearing, and knowing what transpired than the witness McKay. In view of the evidence adduced on the trial we hold that it was not error to refuse the defendant a new trial because of said absent testimony. Code Crim. Proc., art. 560, subdiv. 6; Willson's Crim. Stat., secs. 2169, 2186.

We think the evidence warrants the conviction. It satisfies our minds, as it did that of the jurors, that the defendant and Keller acted together throughout the transaction, in pursuance of a common design and conspiracy between them to kill the Popes, and perhaps others. Phillips v. The State, 26 Texas Ct. App., 228. We think the verdict is a lenient one, considering the gravity of the crime committed and the absence of mitigating circumstances.

Believing that there is no error for which the conviction should be disturbed, and that the defendant has had a fair and impartial trial in accordance with law, the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.