## J. Q. A. CREWS V. THE STATE.

### *No. 716.   Decided June 1.*

1. **Murder—Charge—Circumstantial Evidence.**—On a trial for murder, though there was no eye-witness to the act of killing, yet when the facts and circumstances show defendant in such proximity and juxtaposition to the act of killing as to make it absolutely certain that he committed the deed, *Held*, that a charge upon circumstantial evidence is unnecessary.

2. **Same—Charge—"Cooling Time"—Harmless Error.**—On a trial for murder, where the defense was insulting words and conduct towards a female relative, and the court instructed the jury with regard to "cooling time," in connection with express malice, *Held*, that while "cooling time" had no application to the facts of the case, that this error of the charge was harmless, and could not have misled the jury, in view of a proper and pertinent charge upon manslaughter given by the court upon said defense of insulting words and conduct.

3. **Witness—Impeachment of—Limiting Evidence in Charge.**—Where the wife of defendant was a witness, and for the purpose of impeaching her the prosecution had asked her, if she had been mistreated by the deceased, to which she replied, "If they mistreated her husband, they mistreated her," *Held*, that the court did not err in limiting this evidence, and instructing the jury that it could only be considered by them as affecting her credibility.

4. **Murder—Insanity—Charge—Adequate Cause.**—On a trial for murder, where defendant has introduced testimony as to his insanity, it is not error for the court to submit this issue to the jury. Nor was it error for the court to refuse to give in charge to the jury the question of insanity in connection with "adequate cause."

5. **Same—Evidence of Another Killing than the One for which Defendant was Being Tried—Res Gestæ.**—On a trial for the murder of the husband, where it appeared that deceased and his wife were both shot, and the wife killed and deceased mortally wounded, *Held*, that evidence of the killing of the wife was properly admitted as res gestæ.

6. **Murder of the First Degree.**—See evidence stated in the opinion, *Held*, amply sufficient to support a judgment of conviction for murder of the first degree, with the death penalty.

APPEAL from the District Court of Denton. Tried below before Hon. J. T. BATTORFF, Special Judge.

Appellant was indicted in the District Court of Cooke County for the murder of Thomas Murrell, in said county, on the 12th day of April, 1894. The venue was changed from Cooke to Denton County, and at his trial in this latter county defendant was convicted of murder of the first degree, the penalty being assessed at death.

The facts are sufficiently stated in the opinion. The portions of the charge which were excepted to and complained of are also set out in the opinion.

*H. E. Lobdell* and *C. M. Greenlee*, for appellant.—1. The court erred in failing to instruct the jury on the law of circumstantial evidence. Express malice is a distinct affirmative fact never to be presumed or inferred, and one which can be proved only by circumstantial evidence; and it was incumbent upon, and the duty of the court, to charge upon the law of circumstantial evidence, so that the jury

might arrive at the existence or absence of express malice in defendant's mind, at the time of the commission of the homicide.

2. The court erred in the fourteenth section of his instruction to the jury, wherein said jury is charged, that if, after hearing of said insulting conduct or words towards his (defendant's) wife, said defendant was laboring under a degree of anger, rage, resentment, ·or terror such as would commonly in a person of ordinary temper render the mind incapable of cool reflection, then you will find the defendant guilty of manslaughter, etc. But if you find the defendant had time to coolly reflect and deliberate upon the nature and character of the act and its probable consequences, then such killing would not be manslaughter, but would be murder in either the first or second degree.

We assign this charge as erroneous, because it substitutes time for the actual condition of the mind at the time of the commission of the homicide; and because, further, it requires, to reduce the homicide from murder to manslaughter, that the killing must take place under the immediate influence of sudden passion; and because, further, the jury under the above instructions, in order to reduce the homicide to manslaughter, are required to find, that at the immediate time of hearing of such insulting words and conduct towards defendant's wife defendant's mind became inflamed, his passions aroused, or in other words, that the adequate cause actually existed at the time of the utterance of said insulting language and the performance of said insulting conduct, and continued in existence up to the time of the commission of the homicide. We assign said charge as being erroneous, because it confines adequate cause to the four statutory illustrations, and admits of no other adequate causes; but confines the defendant to avail himself of any adequate cause which might arise to the four statutory illustrations aforesaid, and denies him the privilege of any other adequate causes which might arise, exist, or attach from any or all of the circumstances in said case; and further, because said charge does not instruct the jury, as the law requires, that in order to arrive at a conclusion as to the existence of an adequate cause, they might consider all the circumstance, either singly or collectively, and after such consideration conclude as to whether or not one circumstance be sufficient to produce an adequate cause, and if they find the same is not sufficient, they may consider all the circumstances conjointly, and if they be sufficient to produce an adequate cause when thus considered, then the homicide will be reduced from murder to manslaughter. Further, it matters not what might have been the former condition of defendant's mind prior to the commission of the homicide, the law contemplates only that the adequate cause actually existed in the defendant's mind at the immediate time of the commission of the homicide, and the jury should have been so charged. Jones v. The State, 33 Texas Crim. App., 492; Hawthorn v. The State, 28 Texas Crim. App., 215; Eanes case, 10 Texas Crim. App., 442; Waddlington case, 19 Texas Crim. App., 272; Orman case, 22 Texas Crim. App., 613; Orman case, 24 Texas Crim.

App., 502; Bonner case, 29 Texas Crim. App., 230; Cochran case, 28 Texas Crim. App., 430.

The defendant excepted to the whole of the fifteenth section of the court's charge, as follows: "If you find from the evidence that the witness Mrs. Crews made any statement to witnesses Jeff Brown and Fayette Thomas, or either of them, contradictory of her evidence deposed to before you in this trial, then you are instructed, that you may consider the evidence of such contradictory statements for the purpose of determining the weight and credibility of the evidence of the witness Mrs. Crews, deposed by her before you, but for no other purpose."

We submit that it was immaterial whether the insulting words, conduct, or gestures in fact occurred or not. But if the defendant believed that they did occur, and they were communicated to him by his wife, in a legal sense it is immaterial whether they did or did not occur. Just so the defendant believed they did, and such communication and belief produced the adequate cause, and the deceased was killed as a result of the adequate cause, then the defendant would only be guilty of manslaughter. Said charge erroneously instructed upon the weight and credibility of the testimony of the witness Mrs. Crews, to the irreparable injury of the defendant. Jones v. The State, 33 Texas Crim. Rep., 492.

3. The court erred in the eighteenth section of his instructions to the jury, wherein said jury is charged upon insanity. The evidence tending to show insanity was offered as a circumstance tending to strengthen and thereby aid other circumstances in producing an adequate cause, and to show the jury that the mind of the defendant, because of said hereditary insanity, was more easily excited and inflamed than was the mind of a person in whom hereditary insanity did not exist. Said evidence was offered for the purpose above shown, and not as a perfect defense, and the defendant so stated to the court in the presence and hearing of the jury. Instead of the charge upon insanity, the law and the facts demanded a charge upon adequate cause as set forth in assignment of errors number 6 herein. Bonner v. The State, 29 Texas Crim. App., 230; Cochran v. The State, 28 Texas Crim. App., 430; Williams v. The State, 15 Texas Crim. App., 622.

4. The court erred in the nineteenth section of his instructions to the jury, wherein said jury is charged upon the testimony of defendant's brother, Jesse Crews, in qualifying and confining said witness' testimony entirely to the question of insanity. Said testimony was offered to the jury that they might consider the same for all purposes, the same as the other testimony in the case; and it was so stated in the presence and hearing of the jury. Therefore we think it error for the court to charge upon the weight and qualification of said witness' testimony.

5. The court erred in the twentieth section of his instructions to the jury, wherein said jury is instructed relative to the killing of deceased's wife.

Any reference to the killing of Mrs. Murrell, wife of the deceased, emanating from the court, could only prejudice the defendant in the minds of the jury, and under the law was highly improper to be suggested by the court for any purpose. In any and all events it could only work a hardship and injury to the defendant, and could not possibly throw light upon the killing of the deceased, and even though it did, it could not be considered by the jury for any purpose, it being a separate and distinct offense. Therefore we say the defendant's cause was prejudiced thereby, and we assign said section of said charge as erroneous.

6. We submit, (1) that the court was in error in making any reference or allusion to the killing of deceased's wife by the defendant, and that instruction regarding the same could only engender the prejudice of the jury, and thereby unfairly injure the defendant; and (2) we submit, that said charge was erroneous, and that if any charge or instruction was demanded by the facts upon the killing of the deceased's wife, the court should have charged the jury that the killing of Mrs. Murrell was a separate offense, for which the defendant would be held amenable to the penal laws of the State of Texas; and (3) we submit, that the killing of Mrs. Murrell could not be considered by the jury for any purpose, and that the trial court committed a flagrant error in charging the jury that such killing could be considered by them to determine the motive of defendant in the killing of the deceased, Thomas Murrell.

*Mann Trice*, Assistant Attorney-General, for the State.—Appellant's counsel, in a brief forty-five pages in length, have urged with great ability and much elaboration a number of reasons why the case should be reversed. Many of these grounds of complaint are frivolous in themselves, and undeserving of notice. Others are unsustained by the record. We shall notice only a few of these grounds of complaint, and that not in the order in which they are presented by appellant's counsel. We are unable to understand why the omission from the charge of the latter clause of the statutory definition of murder could in any manner affect the appellant, as there is no negligent or justifiable homicide in this case, and the question of manslaughter was separately submitted in the charge of the court; nor can we understand what benefit it would have been to appellant or his counsel for the court to have defined homicide. It was not necessary in this case to have the legal or technical definition of homicide given; the plain, ordinary, and well known acceptation of the term applied with its full force.

The complaint against the court for omitting to charge on circumstantial evidence is equally without foundation. The dying declarations of the deceased were introduced, and he stated positively who killed him. This of course took the case out of the category of a case resting alone upon circumstantial evidence.

The complaints in reference to the misconduct of the juror and the argument of the county attorney are equally without merit.

The assertion in the brief that the venue of the case was not proven is flatly contradicted by the record.

On page 11 of the brief, under the head of the sixth assignment of error, appellant's counsel launch into an attack upon the fourteenth section of the court's charge, which contains none of the errors complained of, and does contain all the provisions of the law which appellant's counsel claim should appear in the charge. It is hard to understand how counsel so completely misunderstood the charge of the court when they came to prepare their brief. There is not a word in this section of the charge in reference to cooling time. The only instance in which cooling time is referred to in any section of the charge is in the fourth section thereof, with reference to murder in the first degree, but when the court comes to charge on manslaughter, as he does in the fourteenth section of the charge, there is not the slightest reference to cooling time. Counsel gravely state, that the court should have instructed the jury that the question to be considered was not one of cooling time, but was one of the actual condition of the mind at the time of the killing. This the court did in language as clear and as strong as could well be used. In their violent criticism of this fourteenth section of the charge, appellant's counsel insist that the court should not have confined the jury to the only adequate cause proven by appellant on the trial, but should have opened the floodgates for the consideration of all possible adequate causes, whether in the statute or out of it, whether proven or unproven. The court very properly submitted the only adequate cause which appellant relied on, the insulting words and conduct of the deceased toward appellant's wife, and the court submitted the law with reference to this defense fully, fairly, and affirmatively. By an inspection of the charge, it will be seen that it contains none of the other vices denounced by appellant's counsel, and contains everything which they seem disposed to praise in a charge. We will return to the question of manslaughter later in this brief.

It is contended in this case that the charge of the court in reference to cooling time is erroneous, and injuriously affected the defendant on the trial below, and the case of Jones v. The State, 33 Texas Criminal Reports, 492, is relied upon as authority for this contention.

The case of Jones v. The State was a very different case from the one at bar, and the language of the instructions in the two cases was essentially different; and the failure of the court in the Jones case to charge on manslaughter made the charge of the court in that case on cooling time of vital importance in the case, and the charge given, when the omission to charge on manslaughter is considered, was clearly erroneous.

In the Jones case there was no evidence of premeditation; at least no conclusive evidence of it. There was no evidence of lying in wait,

or preparation to kill the deceased. There was no evidence that Jones had sought a meeting for the purpose of killing, and there was evidence of an excited state of mind at the time of the killing; and if the true cause of the killing was the one alleged by Jones, the charge on cooling time was certainly calculated to mislead the jury to the injury of Jones; but had this erroneous charge in reference to cooling time been followed by a charge on manslaughter, which fairly presented Jones' only excuse for the killing, the erroneous charge on cooling time could not possibly have injured Jones.

But how different that case from the one under consideration. In this case, there is every element of premeditation, deliberation, and sedateness of mind that could possibly enter into a case. There is the deliberate preparation to commit the murder There is the deliberate seeking of a meeting with the deceased, or an opportunity to take his life. There is the lying in wait, always considered the highest and strongest evidence of premeditation. In addition to this, there is the picking of the deceased's pockets after he was shot down; the riding away from the premises on the deceased's horse, followed by the flight of the slayer. It would indeed be hard to imagine a case that had less evidence of excitement and inflamed passion in the mind of the slayer, and more evidence of coolness and sedateness of mind than this case exhibits.

If the language of the charge in this case was such as to render it liable to the same criticism to which the charge in the Jones case was subjected, still, we contend that the charge would not be misleading and could not possibly have injured the appellant, for two reasons: 1. There was no question, and there could be none under the evidence, as to the coolness of the slayer's mind at the time of the killing. 2. The charge of the court on manslaughter fairly presented all the excuse the appellant had for the killing, and removed all possible objection to the charge in reference to cooling time. But we contend that the language of the two charges is essentially different. The court expressly informs the jury in this case, that the law prescribes no time that must elapse between the formation of the purpose and the time of the killing, but it should be such as to enable the defendant to deliberate upon the nature and consequences of the act. Now, we submit that this means that the defendant in this case, and under the peculiar circumstances which environed him, must have had sufficient time for his mind to have cooled and for him to have contemplated the act he was about to commit, having reference always to the peculiar circumstances surrounding and confronting the defendant. We can see no substantial difference between telling the jury that the defendant's mind must have cooled sufficiently between the formation of the purpose to kill, and the killing, for him to contemplate the nature and consequences of the act he was about to commit, and in telling the jury that sufficient time must have elapsed for his mind to have become cool and for him to have contemplated the nature and consequences of the act he

was about to commit, particularly so when the jury are informed that the law prescribes no limitation of time in reference to this point.

But whether we are right in this latter view or not, we think we could safely admit that the charge of the court in reference to cooling time was abstractly erroneous, and that possibly in no case ought the court to allude to the question of time, as related to this subject, in his instructions to the jury, but should only submit to them the fact of whether or not the defendant's mind was sufficiently cooled.   For in this case, all the evidence showed the coolness and deliberateness of the appellant's mind; there was no conflicting evidence to raise an issue of this sort; all the proof was one way.   And it being so conclusively shown that defendant's mind was as cool and as free from passion or excitement that interfered in any way with his reasoning faculties as it was possible for the human mind to be, how could an erroneous charge in reference to cooling time have in any manner misled the jury or injured the appellant?

It is also urged in this case, that the court did not submit the issue of manslaughter correctly and fully to the jury.   We think there is one all-sufficient answer to any such contention as this.   The law of manslaughter should not have been given at all, and the giving of the same was an error favorable to appellant, and one to which he could not object.   The appellant sought to bring himself within the fourth subdivision of article 597 of our Penal Code.   His wife testified for him, that the deceased on two different occasions on the same day was guilty of insulting language and conduct towards her, almost in the presence of her husband.   This occurred on the farm of the deceased on Red River, in Cooke County, where appellant and his wife were then living.   Appellant's wife also testified, that soon after this language and conduct on the part of the deceased towards her she informed her husband, after which time he made a trip to his brother's, in Montague County, a distance of forty miles, and back, and then moved his family from Murrell's farm to his brother's, in Montague County.   More than a week after being informed of the conduct of Murrell toward his wife he killed Murrell, at what he claims was the first meeting with Murrell after he had received such information; or at least his attorneys claim it.   He himself did not open his mouth upon the trial.

The circumstances attending the killing, we think, wholly disprove that these alleged insults to his wife were the cause of the killing. Besides, the circumstances attending the killing show beyond any sort of question, and without the slightest contradiction or conflict of testimony, that the mind of the appellant when he killed Murrell was phenominally calm and unruffled.

Article 602 of our Penal Code provides, that in order to reduce a voluntary homicide to the grade of manslaughter, the adequate cause, to produce the requisite state of mind, must have not only existed, but that such state of mind did actually exist at the time of the commission

of the offense. Following this provision, our Court of Appeals have held, in the case of Breedlove, 26 Texas Criminal Appeals, 453, that notwithstanding the adequate cause may exist, still, if the circumstances of the killing showed that at the time of the killing the mind of the slayer was not agitated by passion rendering it incapable of cool reflection, the killing would not be reduced to manslaughter; and in Ex Parte Jones, 31 Texas Criminal Reports, 423, the court use the following language: "In the absence of such passion the adequate cause may become cogent evidence of malice, and an aggravating circumstance attending the commission of the offense." In the case of Wolfforth, 31 Texas Criminal Reports, 387, the court use the following language: "The causes which reduce a killing from murder to manslaughter must be operative in the mind of the slayer at the time of the homicide, in order to bring the killing within the purview of our statutes relating to that offense." In Breedlove's case, the appellant prepared himself with a weapon, traveled one-half of a mile, and secreted himself in a convenient place and waylaid his intended victim; and for this reason the court held that his mind was calm and deliberate, and not agitated by passion rendering it incapable of cool reflection, and therefore the law of manslaughter did not apply in the case.

A week after the alleged insulting words were offered to the wife of the appellant in this case, and after he was informed of the same, he leaves the neighborhood where the insulter of his wife lives, and moves his own family a distance of forty miles, and then returns on Wednesday afternoon, 11th of April, 1894; he goes to a friend in Gainesville and borrows his Winchester rifle, telling him that he wants it for the purpose of killing turkeys. Between that and early next morning he travels from there to Murrell's home, a distance of eleven miles. Being familiar with Murrell's premises, as he had lived there and worked for Murrell before, he secrets himself in Murrell's barn. When morning dawns, and Murrell comes out to feed his stock, as appellant knew to be his custom, he shoots Murrell down from his hiding place in the loft of the barn. Murrell's wife, who doubtless hears her husband's outcry, runs to the barn, and she is shot down. While Murrell is writhing in the agonies of death and weltering in his own blood, appellant picks his pocket, takes out his pocketbook, empties it of its contents, and drops it into the feed basket. He then saddles (if he had not already saddled) one of Murrell's horses, and rides away towards the Indian Territory in a gallop.

Now, we submit, that if appellant killed Murrell because of the alleged insults to his wife, when he did so he was not excited by any sudden passion rendering the mind incapable of cool reflection, arising from any cause, but he was startlingly cool and deliberate. He made his preparation with skill and calmness. He practiced such deceit on his friend Slayton, from whom he borrowed the gun, as would throw him off his guard, and in no manner arouse his suspicion. He planned the time and manner of the assassination of Murrell with a

skill indicating the full possession of all his faculties.   He executed his plans with a thoroughness and completeness only equaled by his skill in laying them, even to the details of his escape.   There is not a shadow of evidence, from the beginning to the end of this inhuman assassination, that indicates in the slightest degree the presence of passion or excitement, or any sort of agitation in the mind of the appellant, but it is attended by such a degree of undisturbed calmness as leads one to believe that appellant was wholly destitute of any human sensibility.   The total absence of any evidence indicating agitation or excitement of mind, and the overwhelming and uncontradicted proof of the wonderful calmness and deliberation that characterized the movements of appellant throughout all this bloody drama, renders it absurd to talk about the doctrine of manslaughter in any manner applying in this case.

The case is one that has every element of murder in the first degree in its most aggravated form, and is as destitute of any mitigation or extenuation growing out of passion or excitement as it is possible for a case to be.   To apply the humane doctrine of manslaughter to such cool and deliberate assassinations as this, would be to pervert the doctrine and purpose of that merciful and just provision of our law.

We could with reason and fairness contend that the alleged insults to the wife of appellant were not the real cause of the murder.   The man who lifts his arm to avenge the virtue of his wife and the purity of his home, whether with or without sudden passion, is not the man to pick the pockets of the fallen and dying insulter of his wife.   But it is unnecessary that we should discuss this feature of this most revolting and cruel transaction.

This view of the question is not urged in order to prevent an examination of the court's charge on the subject of manslaughter.   We submit, that the charge on this subject was correct in every particular, and the only criticism which appellant's counsel make upon it that is sustained by the record is that it informs the jury, that unless the mind of the slayer at the time of the killing was laboring under such a degree of excitement from anger, terror, rage, or sudden resentment as to render the mind incapable of cool reflection, the killing would not be reduced to manslaughter.   This is only a statement of the plain provision of the statute applicable to such cases, which provision has been often recognized by this court as the true rule of law, as appears by the above authorities.   Other objections are urged by appellant's counsel, such as the failure of the court to repeat in different sections the appropriate punishment for the different grades of the offense, when the same had already, been fully and correctly stated. Such objections of course are too trivial for consideration.

We submit that a guiltier man was never tried in Texas.   The atrocity of his crime was never exceeded anywhere.   He has been twice tried with the same result in each case, the first verdict being set aside on account of the misconduct of one of the jurors.   This

last time he has been tried in a county where he was not known; where the deceased was not known; where there was no prejudice nor passion; and after a fair and impartial trial, and an able and zealous defense, he has been convicted and the death penalty assessed. Every protection that the law guaranties to an accused person has been secured to this man. He has had the fullest opportunity to excuse or mitigate his crime. The ends of justice have been fully obtained, or will be when his execution takes place. All of this so clearly appears from the record that no man can entertain a doubt, in our judgment, as to what should be done with this case. We respectfully request that the case be affirmed.

HENDERSON, JUDGE.—The appellant in this case was convicted of murder in the first degree, and his punishment assessed at death, and from the judgment of the lower court he prosecutes this appeal.

In order that the questions raised by the assignments of error may be properly discussed, we will briefly state the substance of the evidence in the case. The evidence in this case for the State shows that the defendant and his wife, a short time previous to the homicide, lived on a farm of the deceased, on Red River, in Cooke County. Said farm seems to have been under the supervision of a couple of sons of the deceased. The defendant was there in the capacity of an employe. Some difference occurred between the defendant and sons of deceased, and about ten days before the homicide deceased went from his home place, which was situated some eight or ten miles from his farm, down to his farm, to bring a load of corn home, and while there endeavored to adjust the difficulty between his sons and defendant, but failed to do so. The defendant and his wife moved off the place to Montague County. On the day before the killing defendant left his home, carrying a pistol with him, but not stating where he was going. He came to Gainesville, and there borrowed a gun from one Slayton, stating that he wanted it to kill some turkeys. The gun was a Winchester rifle. Where he staid that night the record does not inform us, but early next morning the evidence shows that he was at the home of deceased near Calisburg, in Cooke County, some miles from Gainesville. Deceased, with his wife and a minor son, were the only persons living at this place. Early on the morning of the 12th of April, as was his custom, deceased got up and went to his barn, near by, for the purpose of feeding his horse. What occurred at this juncture is best stated in the language of the witnesses. Jesse Murrell, the minor son of the deceased, states: "My father and mother had gotten up before me, and gone out of the room. Just as I was getting up I heard two shots fired. I thought they were at the barn. I could see the barn from the north porch. I ran out on the north porch. Just as I got out where I could see the barn, I heard my mother's voice crying out, 'Don't, Crews, don't!' Immediately two more shots were fired in rapid succession in the barn. I saw no one about the barn at the time.

I at once ran to Mr. Walter Clement's house, which is about 300 yards northwest from our house. I found Mr. Reagan Clements, as well as Mr. Walter Clements, there. We at once returned to the barn. When we got there, we found my father lying at the door of the barn, with his body about halfway in the barn, his feet being in the barn and his head outside. He was lying nearly on his back, kind of raising his head up on his hands. My mother was dead, lying further in the barn than my father, with her head in nearly the opposite direction from his. My father was not dead. He was able to talk, and appeared to know what he was saying. He said he was going to die. Mr. Reagan Clements walked up to my father, and spoke to him, and said, 'Tom, who did this?' My father replied, 'Crews, Crews, Crews,' The feed basket, which we used to carry corn from the crib to the barn, was near my father's side, about half full of corn. In it, and on top of the corn, I saw my father's pocketbook, opened. I knew it was his pocketbook. It was a leather pocketbook, which closed with a strap. The pocketbook was open, and no money in it. When I picked it up, he said, 'Yes, Crews robbed me, and got on old Joe, and is gone.' My father lived about three-quarters of an hour after he was shot. He was moved into the house before he died.''

His testimony was corroborated as to what occurred after they got back to the barn by the two Clementses. The defendant was not there when they got back. The horse Joe, of deceased, and his saddle, were gone. There is testimony of another witness, who lived some few miles from the deceased's house, towards the river, that a half hour after sunup he saw defendant on the horse Joe, riding in a gallop towards the river. It was also shown that in a corner of the barn, where hay had been stored, the hay had been pressed down, and a hole made, as if some one had been standing there for sometime; and from such position the defendant would have a view of persons approaching the barn. It was further in testimony that the defendant, while he worked on deceased's place, was accustomed to wear a long beard that came down on his breast, but that when he came down on this occasion he had no beard. On the part of the defendant, it was shown by his wife, that when deceased came down to the farm on the river, a week or ten days before the killing, to settle the dispute pending between the defendant and sons of the deceased, deceased made indecent proposals to her, which she declined, and that at one time, while they were in the cellar of the house, deceased, against her will, caught her, and kissed her on the cheek. The record shows that she informed her husband, after they had removed from the place, of this conduct of the deceased, and that this was the first time defendant and deceased met after he had been so informed of said insults towards his wife. The defendant also introduced some evidence of insanity in his family.

The appellant assigns as error the failure of the court to give a charge on circumstantial evidence. While it is true in this case that no witnesses testify that they saw the act of killing, yet the facts and

circumstances of this case are of a character to place defendant in such proximity and juxtaposition to the fact of killing as to render such a charge unnecessary, and besides, the statements of deceased and Mrs. Crews were in the nature of positive evidence. Baldwin v. The State, 31 Texas Crim. Rep., 589; Montgomery v. The State (Texas Criminal Appeals), 20 S. W. Rep., 926; Adams v. The State, ante, p. 470. The little boy in the house heard his mother, just before she received her death-wound, cry out to Crews not to shoot; and the father, as soon as they went to him, as a part of the res gestæ, when asked who did it, said that it was Crews, and that he robbed him, and rode off on his horse Joe; and he was seen a short time thereafter, near the scene of the homicide, riding the deceased's horse, with his gun.

In the court's fourth subdivision of the charge, in treating upon express malice, the court informs the jury: "If the design to kill or to inflict the serious bodily harm which might probably end in death was formed while the mind was not in a sedate and deliberate state, but while it was inflamed and excited, then the killing could not be upon express malice, unless sufficient time should elapse, between the formation of the design to kill or to inflict the serious bodily harm above mentioned and the act of killing, for the mind of the slayer to cool, and for him to deliberate upon the character of the act about to be committed before the killing takes place. But in such case the law prescribes no particular time which shall elapse between the formation of the design to kill and the act of killing It only requires that sufficient time shall elapse to enable the slayer to reflect upon the character of the act about to be committed and its probable consequences." This case, in our opinion, does not involve a question of cooling time; and the charge, if it be conceded to be correct in the abstract, has no application to the case on trial. In form it is somewhat like the charge in the Jones case, 33 Texas Criminal Reports, 482; but in that case the court failed to give a charge on manslaugher, as was given in this case.

On the issue presented raising the defense of manslaughter, the court below gave a full and correct charge to the jury applicable to the evidence in the case. The court told the jury, that insulting words or conduct of a person killed towards a female relative of the party guilty of the homicide will constitute "adequate cause, provided the killing occurs immediately upon the happening of the insulting conduct or the uttering of insulting words, or so soon thereafter as the party killing may meet with the person killed, after having been informed of such insults." And the court followed this up with a charge directed to the issue, as follows: "If you believe that the defendant killed the said Murrell by shooting him with a gun; and if you further find and believe from the evidence, that prior to such killing the said Murrell had used any insulting words to the wife of the defendant, or had indulged in any insulting conduct towards her, or if the defendant believed that said Murrell had done so, and acted upon such belief; and if you fur-

ther believe, that the defendant killed said Murrell immediately upon the happening of such insulting conduct or the uttering of such words, or so soon thereafter as he met said Murrell after having been informed thereof, if he was so informed; and if you further believe from the evidence, that said insulting words and conduct, or either, was the cause which induced the defendant to kill said Murrell, if he did kill him; and if you believe further, that at the time of the killing the defendant was laboring under a degree of anger, rage, resentment, or terror, such as would commonly, in a person of ordinary temper, render the mind incapable of cool reflection, then you will find the defendant guilty of manslaughter, and assess his punishment at," etc. This charge properly and pertinently instructed the jury upon the evidence in the case raising the issue of manslaughter; and, in our opinion, although the other charge was not called for, yet it could not possibly have confused or misled the jury.

After laying the predicate, while the wife of defendant was on the stand, as to statements made by her when asked if she had been mistreated by the deceased, and in reply thereto she said, "If they mistreated her husband, they mistreated her," there was no error in the action of the court in limiting this testimony to be considered by the jury merely as going to her credit. And also, as the defendant had introduced testimony on the question of insanity, the court did not err in submitting this issue to the jury. Nor did the court err, as insisted by counsel for appellant, in refusing to give in charge to the jury the question of insanity in connection with "adequate cause."

The court instructed the jury in the twentieth subdivision of the charge as follows: "You are further instructed, that you are not trying defendant for killing Mrs. Murrell, if he did kill her, and can not find him guilty in this case for such killing, if any there was, but the same can only be considered by you as it may throw light upon the circumstances of the killing of Thomas Murrell, if you find that he was killed, and the motive therefor, if you should believe that the same does throw any such light thereon." The defendant assigns this as error. It is sufficient to say in this regard, that the killing of Mrs. Murrell was a part of the res gestæ, and as such was admissible in evidence; and the court properly instructed the jury, that they could only consider such act of killing for the purpose of ascertaining the motive or intent with which defendant may have acted in the killing of Thomas Murrell, the case for which he was then on trial, and the same was not a charge upon the weight of evidence.

A number of other errors are assigned, which it is deemed unnecessary to notice. In our opinion, the charge of the court fairly and correctly submitted the issues in the case. There were but two: The one presented by the State, which characterized the homicide as murder in the first degree, by preparing himself with arms, by lying in wait, and taking undue advantage of his unsuspecting victim. The other was, that he may have been actuated in perpetrating the homi-

cide by passion engendered on account of an insult offered by deceased to his wife. But the jury do not appear to have taken the latter view of the case. They either did not believe that deceased had offered any insults to the wife of defendant, or if he had, that same did not actuate defendant in the killing. Or they may have believed that, notwithstanding said insults, the defendant acted with such cool, calculating malignity as indicated that he was not then laboring under such passion as rendered him incapable of cool reflection. His whole conduct was not of that character to convince the ordinary juror that he was then avenging any insult offered to his wife. Besides preparing himself, he lay in wait for his victim, doubtless during all the hours of the night, knowing, as was his custom, that he would make his appearance in the early morning, and not only took advantage of him, and slew him, but he robbed him of his money and of his horse; and, instead of standing up before the world and avowing his deed, he concealed his identity, and ignominiously sought safety in flight. Such was the conduct of an assassin, and not of a man who strikes for the purity of his family; and no doubt the jury took this view of the killing, and in our opinion they were amply justified in doing so.

There being no errors in the record, the judgment of the lower court is affirmed.

*Affirmed.*

DAVIDSON, Judge, absent.