[File No. Cr. 238]

STATE OF NORTH DAKOTA, Respondent, v. WILLIAM CARL OLIVER, Appellant.

(49 NW2d 564)

Opinion filed Oct. 4, 1951.   Rehearing denied Nov. 8, 1951

*Milton K. Higgins,* and *John E. Williams,* for appellant.

*E. T. Christianson,* Attorney General, and *Robert Vogel,* State's Attorney, for respondent.

CHRISTIANSON, J. The defendant was convicted of the crime of rape in the first degree in the District Court of McLean County and sentenced to fifteen years' imprisonment in the State's Penitentiary. After judgment of conviction had been rendered the defendant moved for a new trial. The motion was denied and the defendant has appealed.

The victim of the alleged rape and the defendant both testified. The facts necessary to an understanding of the questions presented on the appeal may be stated substantially as follows: The crime is alleged to have been committed on August 24, 1950, in the County of McLean in this state. At that time the defendant was 42 years of age, a carpenter by trade, had been married for nine years and was living with his wife and six year old son at Silver City some three miles from Riverdale,—the city constructed by the Federal Government at the Garrison Dam. The defendant had no previous convictions of sex crimes but had been convicted of the crime of robbery in the State of Missouri in 1935 and sentenced to fifteen years imprisonment in the penitentiary of Missouri. He was released from the penitentiary and pardoned after serving some five years and three months of his sentence. The defendant had been working as a carpenter in Riverdale and vicinity. The victim of the alleged rape was one Roberta Vondal, who at the time was six years and six months of age, in the first grade in school, and living with her parents in Silver City. The Olivers and Vondals were acquainted with each other and the two children had played together a good deal. The undisputed evidence shows that on August 24, 1950, the defendant made a trip in his automobile from Silver City to Max, a town approximately 25 miles from Silver City, and back to Silver City. He left Silver City about one o'clock in the afternoon and drove directly to Max. He went there for the purpose of contacting a party with respect to carpenter work. He stated that some carpenters at Riverdale were temporarily out of employment for lack of materials, and he had heard that some carpenter work might be had near Max. The defendant's wife and son and Roberta Vondal accompanied him in the automobile. He saw the party that he went to see. He and his wife and son and Roberta had lunch at a cafe in Max and then re-

turned to Silver City arriving there about 5 o'clock in the afternoon. Roberta testified that she did not eat dinner with the Olivers that evening. She further testified that after they had returned from Max she went with Oliver in his automobile to Riverdale to look at some lumber; that he asked her to go along; that no one else went with them. She said, "after we got back from Max we went to Riverdale to look at the lumber. Q. Who do you mean when you said we, how many went in the car? A. Two." She further testified that the two were Carl, the defendant, and herself. That he got out of the car and looked at the lumber which was on the ground, that he got back in the car and drove out on the Garrison Road. That he drove on this road a little ways and turned off the road and stopped the car on grassland. Thereafter Roberta further testified as follows:

"Q. Then what happened when he stopped—just tell us what happened, Roberta?

"A. He got on top of me.

"Q. Did he do anything with your clothes?

"A. Yes.

"Q. What did he do with your clothes?

"A. Pulled down my pants.

"Q. Did he do anything with his clothes?

"A. Yes.

"Q. What did he do?

"A. Opened up his pants.

"Q. Did you say anything to him then?

"A. Yes.

"Q. What did you say?

"A. I asked him what he was doing?

"Q. What did he say then?

"A. He said, he wouldn't tell me.

"Q. What was he doing then, Roberta, can you tell me what he was doing then, did he touch you?

"A. Yes.

"Q. Where did he touch you—you tell me or show me where he touched you—where was it?

"A. Down here.

Mr. Vogel (State's Attorney): I ask that the record show the witness pointed at her crotch.

"Q. Do you know what it was he touched you with, Roberta?

"A. His hands.

"Q. Did he touch you with anything else?

"A. No.

"Q. Are you sure—did he put anything inside of you?

"A. Yes.

"Q. Was that his hands?

"A. No.

"Q. Some other part of him, was it?

"A. Yes.

"Q. Did you talk to him about it?

"A. I started crying and he said if I didn't quit crying he wouldn't take me home.

"Q. Did he say anything about talking to your mama and daddy about it?

"A. Yes.

"Q. What did he say?

"A. You better not tell your daddy and mama or I will give you a licking. . . .

"Q. Who was it did this?

"A. Carl Oliver.

"Q. What kind of a car did he have?

"A. Hudson.

"Q. Do you remember Carl Oliver now, if you see him?

"A. Yes.

"Q. Do you see him here today?

"A. Down there.

"Q. At the end of the table down there?

"A. Yes.

Mr. Vogel (State's Attorney): I ask that the record show the witness pointed at the defendant. . . .

"Q. Where was it when this happened out in the country, where were you?

"A. In the car.

"Q. Was it on the seat of the car?

"A. Yes.

"Q. Front seat or back seat?

"A. Front seat.

"Q. Then he took you back and left you off at the Drug store?

"A. Yes.

"Q. Then what did you do?

"A. Walked home from the drug store.

"Q. Did you get all the way home?

"A. My mama met me."

Roberta's mother, Mary Vondal, testified that her husband came home from work about 4:30 in the afternoon, that she prepared supper for him and for her brother and after they had had their supper she went to look for Roberta. That when she met her, Roberta was nervous and upset and asked her mother to carry her. That she then picked Roberta up, and that Roberta hugged her mother, and that she was shaking and her mother asked her if she was cold and she said no. That Mrs. Vondal then took Roberta to her brother's house about a block and a half away. That there was no one else present but Roberta and her mother and the mother asked "What is the matter, honey?" and Roberta answered, "Nothing." That the mother then said, "If there is anything wrong, tell me," and that Roberta told her mother little by little what happened to her that day. That Roberta said: "Carl Oliver did something to me. He took me out on the Garrison road. He was going out to Riverdale to look at lumber" and "I got in, we drove to Riverdale and then coming back we drove off the Garrison road. He pulled down my panties and got on top of me and I said 'stop you are hurting me,' and he said he wouldn't, and I was crying, and he said 'you quit crying or I never will bring you home' and I quit crying, and I got in the back seat and came home, and he left me off at the drug store, and he said, if I ever told my mama and daddy he would give me an awful spanking." Mary Vondal further testified: "I asked her, 'did he put anything in you' and Roberta said 'yes, he did,' and I said 'did he hurt you' and Roberta said 'yes.'" Mrs. Vondal testified that her husband was not at

home at the time, that she would say this was about 7 or 7:30 in the evening, that she waited for her husband to come home and that after he came, and in the absence of Roberta, she told him what had happened. That her husband was so excited, he ran out of the house leaving the doors open and that her brother said "get in the car" and that they all drove up to Olivers and that her husband called Carl Oliver out. That he knocked at the door and asked if he could see Carl Oliver and that when Oliver came Vondal said to him "what did you do to my little girl?" and that he then struck.Oliver. That Oliver said, "You are making a mistake." That her brother also struck Oliver. At the time of this altercation Mrs. Oliver was also present and it was suggested by someone that Roberta be taken to the hospital at Riverdale for examination. Mrs. Vondal testified that we—(referring to herself and her husband)—suggested that Roberta be taken to the hospital. The defendant's wife and the defendant testified that the defendant made this suggestion. In any event all the parties went to Riverdale that evening. Roberta and her father and mother went in her father's car and the defendant, his wife and son in the defendant's car. Roberta's mother testified that they were.so excited they drove to the police station, that a man was present, whom she thought was the deputy sheriff, and the highway patrolman. That she talked to them and that they said to take Roberta to the hospital to be examined. That thereupon they went to the hospital where they saw Dr. Shannon and Dr. Shuck and that they both examined her, first one and then the other. That the doctors talked to Roberta about what had happened and that she told them substantially what she had told her mother. That she saw the Olivers pull up shortly after they reached the hospital, that she then called the police station and informed them that Oliver was at the hospital. The undisputed evidence shows that shortly thereafter Oliver was arrested. It was stated that Dr. Shuck had moved to another state and he did not appear as a witness upon the trial. Dr. Shannon, however, appeared as a witness and was examined. He testified:

"Q. What did your physical examination consist of, Doctor?

"A. In the physical examination I first inspected the external

parts and that showed no signs of any trauma. I then separated the lips of the vagina and looked in the inside, we call it the labia minora, in one spot there was a red area, and on this red area there was what we call a collection of material and from this collection of material I took a specimen with a cotton tip applicator and made slides, and also examined the rest of the vagina, and I found no other evidence of any trauma.

"Q. Now, these slides which you mentioned, did you examine them under the microscope also?

"A. I did.

"Q. What did you find?

"A. On these slides, I found on the girl, I found spermatozoa and some biscuit shaped diplococcus, which is consistent with the appearance of gonorrhea.

"Q. This spermatozoa you mentioned is what?

"A. That is the male part necessary for fertilization of the egg for conception of humans.

"Q. That is the male sexual fluid?

"A. No.

"Q. The active component?

"A. That is correct.

"Q. You also found, you say, organisms that had the appearance of gonorrhea germs?

"A. That is correct.

"Q. Where did you find these two things?.

"A. They were inside. They were on the labia majora.

"Q. In other words, you had to separate the external organ in order to find them, is that correct?

"A. That is correct.

"Q. It was within what did you say?

"A. It was inside the vagina on the labia majora.

"Q. In other words, you found the male semen inside the body of this little girl?,

"A. That is correct.

"Q. Now, did you make an examination of the defendant?

"A. That evening, yes, sir.

"Q. About what time was that?

"A. It must have been around eleven or a little after.

"Q. What did that examination consist of?

"A. The police brought him in for me to look at an abrasion he had on his lower lip, and we also took a smear from him.

"Q. What is the procedure on the smear?

"A. It consisted of taking a cotton tip applicator and inserting it in the urethra and made a slide from it.

"Q. That you followed the usual and accepted procedure in making that slide?

"A. Yes, sir.

"Q. Did you examine it under the microscope?

"A. Yes, sir.

"Q. What did you find?

"A. We found pus cells and bacteria which resembled the gonococcus. . . .

"Q. Based on the testimony you have given and the examination you made, do you have an opinion as to whether this defendant was at that time suffering from gonorrhea?

"A. I would make a diagnosis of chronic gonorrhea in his case.

"Q. What would your diagnosis be in the case of the little girl?

"A. You mean such as to venereal disease?

"Q. Yes.

"A. Certainly she did not have gonorrhea, but she had gonococcus. There was no evidence of the disease itself.

"Q. In other words, it would appear that the organisms that she had had recently been inoculated with gonococcus?

"A. Yes, that is what I believe."

Dr. Shannon further testified that he was asked to examine the seats in the defendant's car for any evidence of stains and that he found some stains both in the front seat and in the back seat. That he took specimens from these stains and that slides were made of the stains. That he examined these slides under a microscope and found spermatozoa both on the front seat and the back seat but that they were more numerous in the front seat. He further testified that he examined certain slides from shorts worn by the defendant on August 24, 1950. These slides had been prepared by Sister Ruth Anne in the presence of Sister

Eleanor Mischel, medical technologist and supervisor of laboratory at Riverdale Hospital. Dr. Shannon testified that he examined these slides under the microscope and found spermatozoa on these slides. Sister Eleanor Mischel also testified that she had examined the slides under the microscope and that they disclosed the presence of spermatozoa. When asked if she observed any gonococcus or gonorrhea germs on the slides from the shorts she answered no, and made the further observation "gonococci are very sensitive and they usually die within a half hour after leaving the body. They disintegrate. . . . They die within a half hour unless in a large quantity of pus."

The undisputed evidence shows that after the defendant had been arrested and taken to the jail at Riverdale the police officers requested that he take off his clothing and that his underclothes consisting of a shirt and shorts were taken by the officer and delivered to the chief of police. These clothes were taken to the hospital for examination. The undisputed evidence is to the effect that the defendant put on clean shorts the morning of August 24, 1950. He so testified, and so did his wife. Sister Eleanor Mischel testified that the shorts were slightly stained and that they made washings of the front part and prepared slides therefrom. That this was done under her supervision and that the slides were made in her presence. These slides were examined by Sister Eleanor Mischel and delivered to Dr. Shannon for examination and were the slides concerning which he testified and on which he said he found spermatozoa. Sister Eleanor Mischel testified that they did a stain of the material taken from Roberta Vondal and also made a stain of the material taken by Dr. Shannon from the defendant. She testified that on the slide made from the stain taken from Roberta they found "some spermatozoa pus, gram-positive and gram-negative organism, which included gram-negative biscuit shaped diplococcus," some of those were intracellular and some extracellular. When asked what is a gram-negative biscuit shaped diplococcus, she said: "Most often it is found in a pus cell in early stages of gonorrhea, and in chronic stages of gonorrhea it is found outside pus cells which I term as extracellular." She testified that she found both intracellular and extracellular diplococcus in Roberta

and that they also found intracellular and extracellular diplococcus in the material taken from the defendant but that the intracellular diplococcus were more numerous in the material taken from Roberta.

The defendant denied that he made a trip from Silver City to Riverdale after he returned from Max in the afternoon of August 24, 1950, or that Roberta Vondal went with him on any such trip. He positively contradicted her testimony as to the alleged assault, and testified that he did not on that day or at any other time or any place molest, take any indecent liberties with, or make any assault upon Roberta Vondal. He testified that he returned to Silver City on his trip to Max about 5 o'clock in the afternoon, but that he does not have any specific way of fixing the time. That the first thing he did after returning to his home was to go to one of the neighbors, a Mr. Roth, and obtain a pail of water. That he went back to his house with the water and fed and watered the chickens. That then he lay down on the bed and read the paper for a few minutes when his wife suggested that he go and get the mail. That thereupon he got into his car and went for the mail, that when he reached the Silver City Cafe he stopped and purchased a package of cigarettes and then went back and entered the car and at this time noticed that Roberta Vondal was in the back seat of the car. That he had not noticed her before he left the house and did not know whether she entered the car at the cafe or at the house. That he then drove to the drug store where the post office is located, left the car running while he went in the post office, he received his mail, thereupon returned to the car and drove "straight home." That on the way home from the post office he met the neighbor Roth and his two daughters. That when he reached home he gave his wife a letter from his mother which he had received at the post office. That thereupon he lay down and finished reading the newspaper, after which his wife read aloud the letter from his mother. That his wife told him to get ready for dinner, that it was close to 5:30 or 6 o'clock when they proceeded to eat their dinner. That his son invited Roberta and she ate dinner with them. That after dinner he lay down and listened to the radio and read until shortly after 8 o'clock when there was a knock at the door. That

Mr. Vondal appeared at the door and asked if they might see the defendant. That he stepped out and Vondal then struck him in the face and said, "you have fooled with my little girl and you are going to pay for it;" and that the defendant said, "you are mistaken. We have to get this straight." That Vondal repeated the charge and that the defendant told him to get the little girl and "we will take her to the hospital right now and get this straight." That Vondal answered, "I don't have to take her to the hospital, I know." The defendant testified that after he was arrested that evening and taken to the jail he removed his underclothing and gave it to the officers at the police station. He further testified that he had heard the testimony that the test made at the hospital indicated that semen had been found on the shorts. He was then asked, "Do you know how that might have gotten there?" He answered, "I do." He then testified that 'approximately 12 hours before' he had had sexual relations with a woman in the car. In response to questions he recited the circumstances as follows: I went to Riverdale about 7 o'clock in the morning of August 24, the day the accusation was made. I wanted to see if we were going to work that day. I was told that the load of lumber was coming in but it wouldn't be in in time to work that day. After receiving this information I got in my car and started back home. Along the side of the highway I saw a woman who appeared to be an Indian girl about 26 years of age. She flagged me down and I stopped. She got in the car and asked me if I was going to Garrison. I told her I was going to Big Bend. She asked if I would take her to Garrison. I told her I couldn't, I had to go back to Big Bend to work. She told me she was trying to get back to Garrison, that she had had no breakfast and didn't have any money. She was the same as a prostitute. Her statements indicated that that was her line. She "propositioned me" asked if I would take her to Garrison for a consideration and, that consideration was intercourse. I told her I might consider taking her part of the way to Garrison but I only had a dollar to buy her breakfast, which I gave her. I took her part way to Garrison, drove a short distance off the road and had sexual intercourse with her. The act took place in the front seat of the car. After the act was over she crawled

into the back seat of the car and arranged her clothes. I drove back to the road and we separated. She said she could catch a ride with some workers coming into Garrison.

Appellant contends that the court erred in refusing defendant's request to instruct the jury "on the doctrine of circumstantial evidence;" and that "the court erred in misdirecting the jury on the law of the case by failing to give any instruction on the doctrine of circumstantial evidence."

No error was committed. State v. Foster, 14 ND 561, 105 NW 938; 16 CJ p 1009; Underhill's Criminal Evidence, 4th ed, Sec 19, p 24; 1 Reid's Branson Instructions to Juries, 3rd ed, Sec 65, pp 204–206. The State's case did not rest wholly or principally on circumstantial evidence. The main facts were testified to by eyewitnesses. As the trial court said in a memorandum decision filed with the order denying a new trial:

"The evidence on behalf of both sides was positive and direct. The girl, Roberta Vondal, was the victim of the assault, the defendant in his account of his encounter with the wayside prostitute related the incident personally, directly and positively. The corroborating evidence on both sides was equally direct. The girl testified to the ride in the car with defendant after the return from Max and what took place during the trip; the mother of the girl testified that the girl related the events of the trip to her; the hospital technicians and doctors testified to their examinations of both the girl and the defendant and their findings. Various other witnesses testified to other events during the evening in question and in their testimony fixed the time when the events to which they testified occurred. The testimony of the several witnesses did not agree as to time, but that does not render their testimony circumstantial. The charge to the jury is emphatic that the jury could convict only on the evidence in the case; . . . and that only after each juror was individually satisfied of the defendant's guilt beyond a reasonable doubt could they convict."

In State v. Foster, supra, this court said:

"Error is assigned upon the failure to instruct as to circumstantial evidence. In this no error was committed. The state's case did not rest entirely upon circumstantial evidence. The

main facts were attested by eye witnesses. It is only when a conviction is sought upon circumstantial evidence alone that the trial court is required to charge the law relating thereto. Barnards v. State, 88 Tenn 183, 235, 12 SW 431; State v. Donnelly, 130 Mo 642, 649, 32 SW 1124; State v. Robinson, 117 Mo 663, 23 SW 1066; Cotton v. State, 87 Ala 75, 6 South 396; Weathersby v. State, 29 Tex App 279, 309, 15 SW 823; Hays v. State, 30 Tex App 404, 17 SW 940; Baldwin v. State, 31 Tex Cr R 589, 21 SW 679; Adams v. State, 34 Tex Cr R 470, 31 SW 372; Crews v. State, 34 Tex Cr R 533, 543, 31 SW 373." See also State v. Schneider, 53 ND 931, 208 NW 566.

In the instructions to the jury the court said:

"A person accused of crime is entitled to have the evidence closely and carefully considered and can only be lawfully convicted when after such scrutiny the jury can say upon oath that the evidence leaves in their minds no reasonable doubt of his guilt.

"It is the duty of the jury to scrutinize all of the evidence with the utmost caution and care, bringing to bear such reason and prudence as each member would exercise in the most important affairs of life. . . . To warrant a conviction the defendant must be proved to be guilty so clearly and conclusively that there is no reasonable theory upon which he can be innocent when all of the evidence in the case is considered together, and if the prosecution has failed to make such proof the jury should find the defendant not guilty."

The court also charged the jury,—in instructions the correctness of which is not questioned,—as to the burden of proof, the presumption of innocence and reasonable doubt. He also instructed: "Before you can render a verdict of guilty against this defendant each of you individually must be satisfied beyond a reasonable doubt from a candid and impartial investigation of all of the evidence in the case of the guilt of the defendant. Each juror must act on his own judgment of the evidence."

The next specification of error is:

"The verdict is clearly against the evidence and the evidence is insufficient to sustain the verdict in the following particulars: a. There is no evidence of any penetration of the genitals of the

child by the male organ of the defendant. b. The evidence tends to show that no penetration of the genitals of the girl in question was possible by the defendant or any other mature male."

It is recognized, generally, that penetration of the female organ by the organ of the male is necessary to complete the crime of rape, but there is a wide divergence in the authorities as to the extent of penetration necessary to complete the crime. The same is true as to the statutes defining the crime of rape. 44 Am Jur, Rape, Sec 3, pp 902–903; 52 CJ, Rape, Sec 24, pp 1014–1015. The laws of this state provide: "The essential guilt of rape consists in the outrage to the person and feelings of the female. *Any sexual penetration, however slight, is sufficient to complete the crime.*" NDRC 1943, 12–3003 (Italics supplied). State v. Werner, 16 ND 83, 90, 112 NW 60, 62.

In this case there was ample proof of penetration. According to the testimony, Roberta told the defendant to "stop you are hurting me." She was crying. She said he "put something in her." When asked where he hurt her she pointed to where her female organs are placed.

Dr. Shannon testified further concerning his examination of Roberta Vondal:

"Q. After you made the examination inside you found a red spot which you said indicated a trauma, is that correct?

"A. Yes.

"Q. And that red spot was approximately how large?

"A. About the size of a dime.

"Q. And that was inside the opening of the vagina, was it?

"A. It was inside the labia majora.

"Q. Now, Doctor, you took the smear which you examined microscopically from this red spot that you found at the point you have now described on the little girl?

"A. I took the smear from the part where this material was deposited on the labium, and that happens to be at the place of the abrasion.

"Q. You did take this smear from the area where you found this red spot?

"A. With the deposit on, yes. . . .

"Q. You testified this deposit was found inside of the labia majora?

"A. That is correct. . . .

"Q. And you testified the normal adult male organ could not enter the vaginal canal without causing some damage?

"A. That is correct.

"Q. Now, I am asking if the normal adult male sexual organ could enter the labia majora and labia minora without causing any damage to a six year old child?

"A. I think there would have to be some, but in some cases it would be possible.

"Q. Is there any reason why it would not be possible in the case of this six year old girl?

"A. No good reason."

It is next contended that the court erred in failing to grant defendant's motion for a new trial on the ground that the verdict is contrary to law. This contention is without merit. There is no contention that the verdict is in any manner defective, that it was arrived at by an improper method or that in any other respect the verdict is not in conformity with the law.

It is further contended that the court erred in refusing to set aside the verdict and ordering a new trial "because the evidence is so generally unsatisfactory, that the court should have exercised its discretion by granting the motion therefor, upon the following particulars: The child, Roberta Vondal, repeatedly contradicted herself during her testimony as to the facts pertaining to the alleged crime and as to her understanding of the nature of her oath and punishment for falsehood. And her testimony was so unsatisfactory and so self-contradictory, particularly in charging that the defendant had committed a previous rape upon her the day before the act charged, in his car parked close by his home, in which his wife and son were then, and which act she did not report until after it is claimed the second offense took place, as to shock the conscience of the court and to require judgment of dismissal or granting of a new trial."

Roberta Vondal did testify that the defendant had committed a criminal assault upon her on a previous occasion. In response

to the question propounded to her on cross-examination: "Q. Do you say that Mr. Oliver here treated you the same way once before?, she answered "yes." In response to further questions she testified that this happened in the defendant's automobile standing near his house, on the morning of the day before the incident on August 24th. She further testified that she had not told her mother about this prior attack until in the evening of August 24th, when she told her about the attack the defendant had made on her on that day. Her mother testified to the same effect. In its instructions to the jury relating to the averment in the information as to the time of the commission of the alleged offense the court said: "In regard to time I charge you that the State has sufficiently proven the same if the State has shown to your satisfaction beyond a reasonable doubt that the crime alleged to have been committed, if any, was committed at any time within three years immediately preceding the filing of this information; that is, at any time within three years prior to the 16th day of October, A.D. 1950. *I charge you, however, that the only date involved here is the 24th day of August, 1950, and that the defendant is not being prosecuted in this case for anything that may have occurred on any other date.*"

The instruction which we have italicized was doubtless given through an abundance of caution to insure that in reaching their verdict the jury would consider and base the verdict only upon the evidence relating to the offense charged to have been committed on August 24th.

In support of the assignment that the court erred in not granting a new trial because of the unsatisfactory condition of the evidence generally, and in particular the unsatisfactory and self-contradictory testimony of Roberta Vondal it is in effect contended that because of her age and lack of understanding she was incompetent as a witness; and that in any event her testimony is so unsatisfactory, self-contradictory and unreliable that the verdict should not be permitted to stand, and that the trial court erred in not setting the verdict aside and ordering a dismissal of the action or a new trial of the action.

In a memorandum decision filed with the order denying the motion for a new trial, the court said: "As to the competency of

the girl, Roberta Vondal, as a witness: She was six years old on February 20, 1950, she had started school, she could count to 100 before she started school; she knew the name of the town in which she was living, although having moved there recently; she knew the name of her teacher and that it was a Government school and a Mission Church she was accustomed to attend; she knew the relative location of the school and church at Belcourt; she knew where the road to Garrison was; and, most significantly, she knew that the penalty for untruthfulness was punishment. She was examined by both counsel and the court out of the presence and hearing of the jury, giving generally consistent answers to questions put to her, and lastly she was examined at length in the presence of the jury, her examination covering some 35 pages of typewritten transcript, and while there are contradictions in her testimony, these seem to be the result of failure to understand the questions rather than a desire to give untruthful evidence. In this State there are no statutory provisions declaring persons under a certain age incompetent as witnesses."

In State v. Werner, supra, this court had occasion to consider the question of the competency of a child as a witness. In that case the defendant was convicted of rape in the first degree charged to have been committed on a girl about eight years of age. She was sworn and testified as a witness for the State. It is stated in the decision in the case that she had been afforded but little, if any, school advantages; that she was examined at great length both by counsel and the court with reference to her general knowledge and such examination disclosed a somewhat less degree of intelligence than the ordinary child of her age, but that when her lack of advantages were considered they were not able to say that she was not at least up to the average child of her age intellectually. That it appeared she quite fully understood and comprehended the import of the questions asked her, and that she as a witness was bound to tell the truth with regard to the facts of the case and that she would be subjected to punishment for not so doing. This court sustained the holding of the trial court that she was competent to testify. In the decision in the case this court said: "The correct rule, and the one adopted

by the great weight of modern authorities, is that there is no certain age at which the dividing line between competency and incompetency may be drawn. Intelligence, rather than age, should guide the court in determining the competency of the witness; and the trial court, in the exercise of a sound discretion, after an examination of the witness will determine whether the child possesses sufficient intelligence to comprehend the obligation of an oath. See 3 Jones on Ev. section 738, 739; State v. Juneau, 88 Wis 180, 59 NW 580, 24 LRA 857, 43 Am St Rep 877; State v. Reddington, 64 NW 707, 7 SD 368; Wheeler v. U. S., 159 US 523, 16 Sup Ct 93, 40 L ed 244; State v. Levy, 23 Minn 108; 23 Am Rep 678; 1 Wigmore on Ev. sections 505–507, inclusive. These authorities also hold that the decision of the trial judge as to the competency of the witness will not be disturbed, except for a clear abuse of discretion." 16 ND at p 89, 112 NW at p 62.

In Wheeler v. U. S., 159 US 523, 40 L ed 244, the Supreme Court of the United States had occasion to consider the question of the competency as a witness of a boy five and a half years old on a trial for murder which took place when he was a little less than five years old. In its decision the court said: "That the boy was not by reason of his youth, as a matter of law, absolutely disqualified as a witness, is clear. While no one would think of calling as a witness an infant only two or three years old, there is no precise age which determines the question of competency. This depends on the capacity and intelligence of the child, his appreciation of the difference between truth and falsehood, as well as of his duty to tell the former. The decision of this question rests primarily with the trial judge, who sees the proposed witness, notices his manner, his apparent possession or lack of intelligence, and may resort to any examination which will tend to disclose his capacity and intelligence as well as his understanding of the obligations of an oath. As many of these matters cannot be photographed into the record, the decision of the trial judge will not be disturbed on review unless from that which is preserved it is clear that it was erroneous." 159 US at p 524, 40 L ed at p 247.

In State v. Southmayd, 37 SD 375, 158 NW 404, the Su-

preme Court of South Dakota approved the rule announced by the Supreme Court of the United States in Wheeler v. U. S., supra, and held a girl six years old to be a competent witness in a criminal action in which her father was charged with the murder of her mother. The rule thus announced by the Supreme Court of the United States in Wheeler v. U. S., supra, and adopted by this court in State v. Werner, supra, and by the Supreme Court of South Dakota in State v. Southmayd, supra, are in accord with the great weight of authority as declared by the courts and legal writers.

"It is the province of the court to determine as a matter of law the competency of a witness to testify." 53 Am Jur, Trial, Sec 181, p 155; People v. Bernal, 10 Calif 66; 1 Reid's Branson Instructions to Juries, 3rd ed, Sec 14, p 26. After a witness has been held competent, the question of the credibility and reliability of the witness and the weight which should be given to his testimony are matters for the consideration and determination of the jury. 53 Am Jur, Trial, Sec 181, p 155; 1 Reid's Branson Instructions to Juries, 3rd ed, Sec 27, p 75, Sec 38, p 117 et seq.; 23 CJS Sec 1138, p 634 et seq. "The jury in criminal cases are the exclusive judges of the credibility of the witnesses appearing before them and this prerogative may not be usurped by the court in his instructions." 1 Reid's Branson Instructions to Juries, 3rd ed, Sec 41, p 123. "The question of the weight to be given to conflicting, confused, inconsistent, and contradictory evidence is generally for the jury, not the court, to determine." 53 Am Jur, Trial, Sec 181, p 156; 1 Reid's Branson Instructions to Juries, 3rd ed, Sec 38, p 117 et seq; Stewart v. Olson, 188 Wis 487, 206 NW 909, 44 ALR 1292; F. I. Somers and Sons v. LeClerc, 110 Vt 408, 8 Atl 2d 663, 124 ALR 1494; State v. Burch, 195 Ia 427, 192 NW 287, 31 ALR 198; Christie v. Commonwealth, 193 Ky 799, 237 SW 660, 24 ALR 599; Texas Co. v. Pensacola Maritime Corp. 300 F 51.

"Under our system of criminal jurisprudence it is the peculiar and exclusive province of the jury to weigh the evidence introduced on the trial of a criminal prosecution and determine its credibility or probative value, effect, and sufficiency. If there

is sufficient evidence to carry the question of the defendant's guilt to the jury, the weight to be attached to it is wholly within the province of the jury. The credibility of witnesses who are competent to testify is likewise a matter within the province of the jury. The jury are at liberty to give testimony only such credit as upon the whole they thing it deserves. Thus, conflict of evidence in a criminal case is peculiarly a question to be settled by the jury." 53 Am Jur, Trial, Sec 282, pp 238–239.

In this case Roberta Vondal was examined at length by the court and by counsel for the respective parties. After such examination the court reached the conclusion that she was competent to testify as a witness in the case. A transcript of the examination has been transmitted to this court and we are all agreed that the court committed no error in holding that Roberta Vondal was a competent witness.

In the memorandum decision filed with the order denying a new trial the court said: "Facts either admitted by the defendant, or so conclusively established by the evidence as to be beyond question, furnish not only ample support for the verdict returned by the jury but lead to the firm conviction that the defendant's guilt was established by the evidence beyond a reasonable doubt." The court thereupon reviewed and analyzed the evidence. After such review the court stated:

"There are contradictions and discrepancies in the evidence, but no more so than the contradictions and discrepancies that are found in the trial of any law suit. It is evident the jury did not believe the defendant's testimony with reference to his encounter with the wayside prostitute. The court did not believe it. Still, it is a fact, that that testimony might be true and the defendant guilty."

"This is not a case where other evidence has been offered that would destroy the effect of the evidence produced by the State. Manifestly the defendant is not required to disprove his guilt; but the evidence in this case viewed calmly and dispassionately is more than ample to sustain the verdict returned by the jury."

"The court is unable to find anything inconsistent, unusual, or extraordinary in the testimony of either the little girl or her

mother. It seems to the court that a fair appraisal of their evidence in this case points unerringly and directly to the guilt of the defendant."

"In the instant case the court is of the opinion that the verdict is in harmony with the evidence."

The acts of the defendant concerning which Roberta Vondal testified had occurred only a few hours before she related the matter to her mother. A short time thereafter and that same evening Roberta Vondal was examined by a doctor and in response to questions propounded to her by the doctor incident to the examination she again related what had transpired between the defendant and herself. In the main there is no essential difference between what she told her mother as to what had transpired between the defendant and herself and what she later related to the doctor and what she related upon the trial of the action. We are all agreed that the court did not err in refusing to set aside the verdict because of insufficiency of the evidence or because of the alleged unsatisfactory character of the evidence and of the testimony of Roberta Vondal.

The order denying a new trial is affirmed.

MORRIS, C.J., and SATHRE, GRIMSON and BURKE, JJ., concur.